MARIE F. CUTLIP ET AL. *v.* LUCKY
STORES, INC. ET AL.

[No. 952, September Term, 1973.]

*Decided September 20, 1974.*

674

The cause was argued before ORTH, C. J., and THOMPSON and LOWE, JJ.

*William J. Rowan, III* and *James A. Sullivan,* with whom were *Heeney, McAuliffe & Rowan* and *McInerney, Layne & McCormick* and *Edward B. Layne, Jr.,* on the brief, for appellants.

*David A. Levin,* with whom were *Jacob S. Levin* and *Levin & Levin* on the brief, for appellees.

LOWE, J., delivered the opinion of the Court.

The gambling instinct endemic to our former frontier society has been replaced by a quest for security with which our contemporary society is identified. Even at law society is inclined toward certainty of result, not infrequently at the expense of unsurfeited recovery. Workmen's Compensation, mandatory insurance programs and the trend toward no-fault insurance are but weathervanes of that direction. Even the "plea bargain" in criminal law has as its genesis the desire for a secure result for both the State and defendant in place of the element of chance inherent in a trial.

In retrospect, however, the hazards of a trial are forgotten, and thoughts of "what might have been" give heart to injured litigants who seek deeper pockets from which to make themselves whole. Pressed by those they represent, members of the legal profession during recent decades have more carefully perused disaster's peripheries for contributing acts or omissions by professionals whose conduct might not measure up to an accepted standard. That lawyers have not shunned their brethren in this pecuniary pursuit is small solace to appellee MacDonald and Englehardt, an architectural firm (hereafter referred to as

Englehardt) or its principal Lucky Stores, Inc. (to whom we shall allude as owner [1] or Lucky), a California based corporation which retained Englehardt to design and supervise the construction of a department store in Prince George's County.

Robert Lee Cutlip, a twenty-eight year old iron worker was killed on the job in the course of erecting the steel structure for the store when a portion of the nearly completed building collapsed. Mr. Cutlip was employed by Abbott Steel Erectors, Inc., the structural steel subcontractor on the job. Workmen's Compensation provided his widow and children with a recompense of sorts. That limited recovery ($70 per week up to a maximum of $27,500.00) is the exclusive remedy against the employer, Abbott Steel Erectors, Inc., as well as against Kettler Brothers, the general contractor. Thus restricted by the Act, Mr. Cutlip's widow and children seek additional succor from Lucky and Englehardt through an action for the wrongful death of the husband and father.[2]

Lucky had intended to have erected a "Memco" department store on the construction site. It engaged Englehardt to furnish plans acceptable to it and to the local authorities. Although the contract called for periodic inspection and supervision it did " . . . not constitute continuous personal supervision of construction as obtained by the employment of a clerk-of-the-works." [3] Lucky contracted with Kettler Bros. to build the store for which

---

1. Although Lucky Stores, Inc. was actually the lessee of the construction site the fact is not significant here and the use of the term may be misleading.

2. Several other parties were initially included directly or by third party actions; however, their dismissals have all been agreed or acceded to by the parties to this appeal. The case against the owner Lucky and the architect Englehardt was tried before a jury. The case against Lucky was taken from the jury on directed verdict at the end of the entire case. The jury was unable to reach a verdict against the architect and a mistrial was declared. The trial judge subsequently granted judgment N.O.V. on behalf of the architect.

3. "Clerk-of-the-works" and its contemporary successors, "resident inspector" or "project representative" refer to a person selected by the owner and architect, although paid by the owner, to provide continuous supervision when required by the owner. See Miller v. DeWitt, 37 Ill. 2d 273, 226 N.E.2d 630, 643 (dissenting opinion).

Englehardt had provided the plans and specifications. Those plans and specifications had been prepared by a structural engineer, Peter J. Caffes, whom Englehardt retained for that purpose. Englehardt did not turn over the responsibility for the inspection and supervision of the structure to Caffes, however. He retained it for himself.

Appellants attempt to hold the owner responsible through the architect for the death of Mr. Cutlip by taking us down one or all of three paths, each of which they contend arrives at their desired destination. The terminus they seek is marked by the maxim *respondeat superior*, let the master answer. More aptly interpreted, that apothegm means that a master is responsible under certain circumstances for the acts of his servant or the principal is responsible for the acts of his agent within the scope of his employment.

A contrary rule often viewed as an exception to that of *respondeat superior*, is that the employer of an independent contractor is *not* subject to liability for bodily harm caused to another by a tortious act or omission of the independent contractor. This aphorism has had appended to it some twenty exceptions, each of which would lead the appellants to their desired goal, of holding Lucky responsible for the death of Mr. Cutlip.

To accomplish that purpose appellants must either establish that the architect Englehardt was an agent (servant) of Lucky or, failing that they must bring Lucky within one of the exceptions to the independent contractor rule. See, *Restatement of Torts*, 2nd, §§ 410-429. Appellants assert only two of those exceptions as applicable here. One is expressed in *Le Vonas v. Acme Paper Board Co.*, 184 Md. 16, and the other brought to us in the language of the *Restatement of Torts*, 2nd, § 416, the principle of which is discussed in *Weilbacher v. Putts Co.*, 123 Md. 249.

None of appellants' three approaches has convinced us.

## Agency

The distinction between an independent contractor and a servant is not easily made, in part because neither term is capable of exact definition. The master-servant relation is

encompassed by the generic concept of principal-agent, but is unique in that the master exercises considerably more control over the activity of his servant than does the ordinary principal over his agent. There may be agents for example, who agree only to use care and skill to accomplish a result without subjecting themselves to control by or obedience to the principal in the manner of accomplishing that result.[4] In that situation, although a principal-agent relation may be said to exist, the control and supervision peculiar to the master-servant relation are absent, and thus the principal is ordinarily not subjected to the liability that would be imposed on a master for the tortious conduct of a servant within the scope of his employment.

Similarly, an independent contractor — whether or not an agent — agrees only to accomplish physical results. Thus in distinguishing an independent contractor from a servant, the quantum of the owner's retained control and supervision is the determinative factor.

Whatever we choose to call the architect, the purpose of our inquiry is to determine whether upon employing him, Lucky had the right to control the details of his movements during his performance of the business agreed to do. *Greer Lines Co. v. Roberts*, 216 Md. 69, 82; *Gallagher's Estate v. Battle*, 209 Md. 592, 602; *Globe Indemnity Co. v. Victill Corp., supra*, 582. Unless Englehardt's allegedly negligent actions were done in a manner directed or authorized by Lucky liability does not attach. 1 *Restatement of Agency*, § 250. The key element of control, or right to control " . . . must exist in respect to the very thing from which the injury arose." *Gallagher's Estate v. Battle, supra*, 602.

Our inquiry then narrows to the question of what evidence was introduced by appellants indicating control by Lucky of the manner in which Englehardt performed his work. The

---

4. "An agent is a person who represents another in contractual negotiations or transactions akin thereto. A servant is a person who is employed to perform personal services for another in his affairs, and who, in respect to his physical movements in the performance of the service, is subject to the other's control or right of control. Persons who render service but retain control over the manner of doing it are not servants." Globe Indemnity Co. v. Victill Corp., 208 Md. 573, 581.

burden of proving this agency relationship is clearly appellants'. *P. Flanigan & Sons, Inc. v. Childs*, 251 Md. 646, 655. Appellants suggest three possibilities to show they have met that burden.

Their first contention on the question of agency hinges upon a clause in the contract which stated that the contract would be controlled by the principal place of business of Lucky, *i.e.*, California. They contend that adoption of foreign law by contract has the same effect as its adoption by rule of law. Appellants then state that because they relied on a reference in the *American Jurisprudence* encyclopedia, that an architect supervising construction is usually acting as an agent of the owner, which cited a California case as authority in the supplement, they were relieved of the Maryland burden of proving agency.

But appellants failed to comply with the requirement of Md. Code, Art. 35, § 50 requiring reasonable notice to adverse parties of an intent to rely on foreign laws nor did they assert such intent in their pleadings. Neither did appellants submit to the trial court evidence of the foreign law nor ask that judicial notice be taken of the law they would rely upon. It is certainly not enough that appellants sought to rely on the substance of an encyclopedic statement which incidentally cited in a footnote a California case.[5] The point not having been mentioned to the court below, let alone tried and decided, will not now be entertained. Md. Rule 1085.

---

5. The encyclopedic citation, 5 Am.Jur.2d, Architects, § 6, (1973 Supplement), cites Trane Co. v. Gilbert, 267 Cal.App.2d 720, 73 Cal. Rptr. 279. The California authority was not mentioned at the trial nor was the issue of reliance on California law. The entire episode was as follows:

"Now, on the question of whether Englehardt is the agent of Lucky on that question we would refer Your Honor to 5 Am.Jur.2d, Architects, Section 6:

'As a general rule an architect, as far as the preparation of plans is concerned, acts as an independent contractor. But so far as regards the performance of his supervisory functions with respect to a building under construction, he ordinarily acts as the agent and representative of the person for whom the work is being done.'"

680

Appellants' next two arguments on the agency concept are presented in their entirety:

"Aside from the stipulated reliance on foreign law, the jury could have found an agency relationship based on Englehardt's almost daily contact with Lucky together with the elements of control present in the written contract. Appellee-Englehardt's own expert architect testified he could not imagine such frequent contact, and that it was unheard of. From these facts, the jury could have reasonably found that Englehardt was the agent of Lucky."

We can dispose of them as summarily as they were presented. The contract between Englehardt and Lucky contains not a single indication of control retained by Lucky over the areas of responsibility assigned to Englehardt. To the contrary, it shows Lucky's total reliance on Englehardt not only to provide the plans and specifications but to protect Lucky's interests *vis a vis* the contractor as well. Each duty charged to Englehardt is couched in terms granting him absolute discretion save only the " . . . approval of various colors, finishes and textures . . .," which Lucky preserved to itself. Even then the architect is required to "assist the OWNER in [their] selection . . . ."

While the contract is the primary source to seek any limitations upon the delegation of authority by owner to architect, the relation between them may be changed by words or actions outside the contract. Evidence thereof must be affirmatively shown by appellants however, and the record here is all but silent. The only testimony on the question was that of Ivor Donaldson who testified that he was property engineer in Lucky's home office at the time of the accident. He was asked:

"Did you exercise any control over this architect in the manner in which he was to perform his work? ";

to which he responded,

"A. Did we exercise any control? The only control

we exercised was that of the aesthetic beauty of the building to make sure that he laid it out properly and the store fixtures were functioning within the store."

He later added that Lucky had approved the plans and specifications submitted by Englehardt. There is no evidence in the record whatsoever to indicate any control.

Nor does the procedure with which Englehardt inspected or the frequency with which he reported progress to Lucky vary his authority or indicate withdrawal by it of Englehardt's control of the details and manner of his work. The very purpose and intent of the inspection were expressed in the contract as being to " . . . expedite the progress of the construction and to . . . guard OWNER against defects and deficiencies . . . ." The emphasis is not that of the Court. It appears in the contract.

Replying to an argument analagous to that of appellants in *Ott v. Washington Gas Light Co.*, 205 F. Supp. 815, 820, aff'd *sub nom. J. H. DeVeau and Son, Inc. v. Ott*, 317 F. 2d 138, Judge Holtzoff summarized his reasoning by an application of simple logic:

"Counsel for the plaintiff points to the fact that the Washington Gas Light Company had an inspector whose function was to visit the various jobs to determine that the work was being done in accordance with the contract contained in the repair order and to make any suggestions or give any advice that might appear proper. Obviously his function was no different from that of an architect employed by a property owner in connection with supervising the construction of a building by a contractor, or the function of any inspector who represents the owner for whom a contractor is doing work. *The activities of such an inspector do not constitute such control as to burden his employer with any liability for the negligence of the contractor's employees. Were the law otherwise, it would be a dangerous matter for any property*

> *owner to have an architect supervising or representing him in connection with the construction of a building by a contractor, or for any property owner to have an inspector inspecting work that is being done for him.*" (Emphasis added)

That reasoning is apropos here as well. Lucky was a California based corporation. There was, during the entire period of construction, only one visit by one company official to the "Memco" site and that arose out of incidental curiosity during the corporate officer's honeymoon. The average property owner's lack of expertise in construction requires the retention of experts to protect his interests. That need is enhanced in proportion to the distance which separates the owner from the construction site. All the more should an architect, the expert retained to protect one's substantial investment, be expected not simply to make periodic inspections but to report frequently on the progress over which the owner lacks the power even to observe let alone control. "Owners are very much in the power of builders and architects." *McNulty v. Keyser Bldg. Co.*, 112 Md. 638, 643. Evidence of Lucky's control of the manner in which Englehardt performed his duties was as remote as Lucky's proximity to the site — a continent away.

Having found no retention of control of Englehardt's duties, and hence no conduit of liability to Lucky on the agency premise, we look to

> " . . . the Alternative Theories of the Appellants for the Imposition of Liability Against Lucky, the Lessee, Under *Le Vonas vs. Acme Paper Board Company* and/or Section 416, Restatement of Torts, 2nd."

### Condition of the Premises

An "alternative theory" of employer-owner liability is propounded by appellants through their interpretation of *Le Vonas v. Acme Paper Board Co.*, 184 Md. 16. The essence of *Le Vonas* is summarized at page 20 by Judge Delaplaine:

> "In other words, liability for injuries to a servant of

an independent contractor rests upon the owner when the premises on which the stipulated work is done remain under his control and the injuries arise out of the abnormally dangerous condition of the premises, the owner being chargeable with knowledge of the danger."

*Le Vonas* espouses no profound doctrine of unique origin. It simply states that an owner may be liable for injuries to an employee of an independent contractor when the premises on which the contracted work is done remain under the owner's control and the injury arises out of an abnormally dangerous condition of the premises, of which condition the owner is chargeable with knowledge. The ground of liability is the owner's superior knowledge of the danger to persons going upon the property. *Bohlen v. Glenn L. Martin Co.*, 193 Md. 454, 460-461.

The appellants point to the defective concrete pier which collapsed as "a pre-existing concealed peril" fulfilling *Le Vonas'* " . . . abnormally dangerous condition of the premises . . . ." We do not consider that *Le Vonas* contemplated the work product of a contractor erected after he takes control of the premises, as a "dangerous condition of the premises" from which the contractor's employees must be protected by the owner at his peril. The "abnormally dangerous conditions on the premises" referred to in *Le Vonas* do not include conditions which arise after and as a result of the independent contract. The "conditions" are those latent dangers preexisting the contract and carrying over without the owner's taking precautions to guard against the conditions before he permits others to occupy the premises.

There is an additional prerequisite to an owner's liability in *Le Vonas* — control of the premises. We see that ingredient of owner's "control" appearing in *Le Vonas* as being based upon his knowledge or superior ability to know of the existence of the "abnormally dangerous condition of the premises," from which "the injuries arise." That superior vantage point to gain knowledge of latent peril is what gives

rise to his duty to act. See *Vail v. Walker*, 199 Md. 441. Here there is no evidence of a preexisting dangerous condition, either concealed or apparent, which leaves as moot any consideration of the element of control. If there was no latent peril, there can be no superior vantage from which to view it.

## Peculiar Risk

The principle espoused in the Restatement of Torts, 2nd, § 416 is posed as the final alternative by appellants:

> "One who employs an independent contractor to do work which the employer should recognize as likely to create during its progress a peculiar risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the failure of the contractor to exercise reasonable care to take such precautions, even though the employer has provided for such precautions in the contract or otherwise."

*Le Vonas* espoused a theory differing in emphasis from § 416 of the *Restatement*. The *Restatement* deals with the liability of such employers for " . . . *work* . . . likely to create . . . a peculiar risk . . .," the knowledge of which employer is charged. (Emphasis added.) The employer's liability dealt with in *Le Vonas* is restricted to the "condition of the premises . . ." and negligence is assessed in the event of an abnormally dangerous condition of which the employer is chargeable with knowledge but is not readily apparent to an employee of the independent contractor.

Appellants point out that a "peculiar risk" defined under § 416 in the Reporter's Note (d) "is a risk differing from the common risk to which persons in general are commonly subjected by the ordinary forms of negligence which are usual in the community. It must involve some special hazard resulting from the nature of the work done, which calls for special precautions." We agree and our review of the record gives no indication of a "peculiar risk" or "special hazard . . .

differing from the common risk" arising from the use of structural steel or concrete in the construction of a building.

Considerations to be given in determining the risk contemplated by § 416 were discussed in *Weilbacher v. Putts Co., supra*, 259-260:

"In the case of *Laffery v. Gypsum Co.*, 83 Kansas, 349, the Court, after referring to the general rule which exempts the employer from liability where the work is done by an independent contractor, and to the exception to that rule in cases where the work is intrinsically dangerous, however skillfully performed, said: 'No effort will be made to define precisely the expressions 'intrinsically dangerous' or 'inherently dangerous,' or like phraseology, as used in the authorities. Regard must be had to the reason of the principle and the consequences flowing from its application in the given situation. The mere liability to injury from doing the work cannot be the test, for injuries may happen in any undertaking, and many are attended with great danger if carelessly managed, although with proper care they are not specially hazardous.' *After stating further that although the erection of buildings in cities is attended with hazards, such work has not been regarded as coming within the rule applicable to work intrinsically dangerous*, the Court quotes with approval the statement of MR. CHIEF JUSTICE COCKBURN in *Bower v. Peate*, L. R. (1876), 1 Q. B. Div. 321, that, 'There is an obvious difference between committing work to a contractor to be executed from which, if properly done, no injurious consequences can arise, and handing over to him work to be done from which mischievous consequences will arise unless preventive measures are adopted.' " (Emphasis added.)

The underlying principle of the *Restatement of Torts* § 416 is not interpreted by the Court of Appeals to apply so

broadly as we are urged by appellants. Were we to find customary phases of building construction so peculiarly hazardous as to create a nondelegable duty from the property owner to employees of an independent contractor, property owners improving their premises would become insurers.

We are inclined to the view that "Ordinary building operations or activities, including both construction and demolition, are generally not considered work of an inherently or intrinsically dangerous character rendering the employer-owner liable for injuries resulting from the negligence of an independent contractor in doing the work." 41 Am.Jur.2d, Independent Contractors, § 43. The record discloses only two theories of the cause of the accident, either a defective concrete base and/or the failure to stabilize the structural steel beams during erection with safety "guy" wires or cables. Negligence in either instance, or both instances, is a "common risk" of structural steel construction. A review of the record convinces us that " 'The accident was caused by the act of the contractor in doing what it was not necessary for him to do, what he was not expected to do, and what he did not intend to do . . . [T]he work could not be classed as work which, if properly done, was ordinarily attended with danger to the public. The negligence, if any, was in the mere detail of the work.' " *Weilbacher v. Putts Co., supra,* 259, quoting from *Boomer v. Wilbur, et. al.,* 176 Mass. 482, 57 N. E. 1004.

## The Architect's Liability

Having found the owner divested of liability, we are then left with the question of what if any responsibility the architect owed to the employees of the contractor who were lawfully on the premises. Appellants' theory, novel in Maryland, is based upon a statement in 5 Am.Jur.2d, Architects, § 25.

> "An architect's liability for negligence resulting in personal injury or death may be based upon his supervisory activities . . . . The liability of the architect, moreover, is not limited to the owner who

employed him; the modern view is that privity of contract is not a prerequisite to liability." (Footnotes omitted.)

Appellants bolster this general premise by citing *Clemens v. Benzinger*, 211 App. Div. 586, 207 N.Y.S. 539, and quoting from *Geer v. Bennett*, Fla. App., 237 So. 2d 311, 316:

> "An architect may be liable for negligence in failing to exercise the ordinary skill of his profession, which results in the erection of an unsafe structure whereby anybody lawfully on the premises is injured. Possible liability for negligence resulting in personal injuries may be based upon their supervisory activities, or upon defects in the plans or both. Their possible liability is not limited to the owner who employed them. Privity of contract is not a prerequisite to liability. They are under a duty to exercise such reasonable care, technical skill and ability, and diligence as are ordinarily required of architects in the course of their plans, inspections and supervisions during construction for the protection of any person who foreseeably and with reasonable certainty might be injured by their failure to do so."

Appellants contend that even if we assume that contractual provisions regarding inspection or supervision may have been originally intended to protect only the owner, Englehardt assumed an additional responsibility of inspection for a purpose that justified Cutlip's reliance and created a corresponding duty.

In order to comply with the contractual guarantee "that a building permit shall be issued," Englehardt was required to provide Prince George's County with a field inspection and report agreement. Pursuant to this requirement, he committed himself by letter of August 11, 1969 to the county engineer:

> "Dear Sir:
>
> In accord with the Prince George's County

requirements we will make field inspections and furnish the following reports:

1. Concrete test and reports.
2. All structural steel, field and shopiinspections [sic] reports.
3. All Architect and Engineer job visit reports.
4. Progress meeting reports, if held.
5. Any changes must be approved bytthe [sic] Department first before work is started.
6. A certified certificate (signed and sealed) by the Structural Engineer that all structural steel and joists have been inspected and approved.

Sincerely,

MACDONALD & ENGLEHART

Charles W. Englehart

CWE/dpw"

Near the completion of construction, Ralph Collins, Kettler's superintendent, called Englehardt and told him that either certain steel beams were not the proper length or that the concrete piers upon which the beams were to be erected were not in the correct location. He proposed two alternative solutions, *i.e.,* send the steel back to be refabricated or pour a new concrete base and pillar situated to accommodate the lengths of the beams.

Their testimony then becomes contradictory. Englehardt claims that no decision was made but that Collins was to review the situation again and call him back after Englehardt had contacted the structural engineer who had designed the building for him. Collins stated that Englehardt directed him to pour the new base in order to avoid delay. Whichever version was correct, a new pier was poured, immediately adjacent to the old one. Two days later the ironwork crew came and started to erect the structural

steel. During that phase Robert Cutlip was killed. He was crushed by the collapsing portion of the steel superstructure upon which he had been working 30 feet above the ground. As noted above, the sole possible causes of that collapse which were suggested in the record were either failing to use guy wires or cables to stabilize the steel structure as it was erected, or placing too much weight on the concrete while it was still "green" (not properly hardened). Evidence indicated that the customary curing time for these pillars as set forth in the plans and specifications was 28 days at a temperature of 70°. Even when a fast-hardening substance like the one ordered by Mr. Collins is included in the cement mix, testimony indicated that a minimum of 7 days is required for proper cure. In addition, the concrete was poured in below freezing weather, which is not conducive to the curing of concrete. Finally there was evidence indicating that fewer iron rods were implanted in the concrete for support than were called for by the plans.

In order to sustain appellants' claim, testimony viewed in the light most favorable to the plaintiffs both at trial, *Beck v. Baltimore Transit Co.*, 190 Md. 506, 509 and upon our own review, *Moran v. Williams*, 19 Md. App. 546, 551-552, must indicate that:

a) the architect owes a duty to the worker,

b) he breached the duty,

c) the damage resulted from that breach, and

d) there was a reasonably close connection between the architect's conduct and the loss sustained, *i.e.*, the question of fact to be answered, whether the conduct of Englehardt caused the plaintiff's harm.

The delineation of these guides tends to highlight the interrelated problems of causation and proximate cause. What we term causation is a question of pure fact embracing everything that contributed to the accident, "but for" which it would not have occurred. It is the jury alone which decides causation in fact. Although it was conceded

that a major element of causation was the conduct of Kettler's superintendent, Collins, this fact does not preclude an additional causative factor which may also be a *sine qua non* or a substantial factor in producing the accident.

Before arriving at the factual determination of causation, the court must face the more ethereal concept of "proximate cause," the absence of which may limit liability as a matter of law even when the causative factor is clearly established. The "proximate cause," which Professor Prosser feels would be better termed " 'legal cause' or perhaps even 'responsible cause,' " is a court rather than a jury determination. Prosser, *Law of Torts*, § 42 (4th Ed.) It is a causation in fact coupled with a duty. Somewhat oversimplified, if there is *some* evidence of fault conflicting though it may be, the court's preliminary determination of the existence of proximate cause is practically narrowed to the question of whether the architect was under a duty to guard the employee against the accident which occurred. Only if such *duty* is found to exist, should the jury consider the *conduct* of Englehardt, *i.e.*, whether he breached that duty and if so did the breach cause the accident resulting in Cutlip's death.

### The Conduct

Looking at the evidence in the light most favorable to appellant, or conversely in the light least favorable to Englehardt, the trier of fact could find that:

1. Upon being advised by Superintendent Collins that the steel was too short or the pier misplaced and that there were two alternative solutions to the problem, *Englehardt advised Collins* to " ... *go ahead and pour* the pier and save two or three weeks time, get the pier poured."

2. Although Englehardt had a structural engineer (Peter J. Caffes) "design the building and make the structural drawings and to be available for consultation," *Englehardt reserved to himself the structural supervising work.*

3. *John H. Sullivan,* a registered architect who

testified as an *expert witness, stated that* in his opinion *architects* (such as Englehardt) *were not qualified to perform structural engineering inspection.*[6]

4. Mr. Sullivan also expressed the opinion that when he was advised of the field problem, the architect (Englehardt) should have contacted the structural engineer, informed him of the necessary changes and authorized a redesign by the engineer.

"In order to redesign the footing or footings in question, it would be prudent for the architect, and/or engineer, to visit the site to make sure that the entire scope of the change is understood, that in fact the footing was to be moved, east, west, north or south. It would be of paramount importance. Therefore, I feel that it would be a logical move on

---

6. "Q. And let me ask you this: Based on your professional experience as an architect practicing in Prince George's County for seventeen years, in your opinion is an architect professionally qualified to perform structural engineering inspection services?

"MR. HASKELL: Objection.

"THE COURT: Overruled.

"THE WITNESS: I do not feel that an architect is qualified to perform structural engineering inspection.

"BY MR. LAYNE:

"Q. Who is the professionally qualified person to do that, sir?

"A. A structural engineer that an architect would retain on a consulting basis, or he might have him in his firm if they are large enough."

If a duty to Cutlip exists, Englehardt's lack of such qualifications would itself create a proper question of fact for jury determination. Evidence of this nature might be equated with expert testimony in a medical malpractice case that a general practitioner of medicine is not qualified to perform orthopedic surgery. Together with evidence of failure to conform to a recognized and expected standard of conduct, which failure could have caused an injury, there evolves a jury question.

"He would certainly visit the area of columns D Sub 1 13 and D Sub 1 14, either individually or with the engineer, depending upon the circumstances, and with the general contractor's superintendent, and observe the condition that led to this change in design. He would go to that immediate area."

From Englehardt's failure to recognize the problem as one of redesign, and act accordingly, it could be concluded by the fact finders that Englehardt's assumption of responsibility of structural inspection for which he was not qualified was a substantial causative factor of the accident.

the part of the architect or engineer to visit the site within a reasonable period of time." The "reasonable period of time" was explained by Mr. Sullivan's subsequent testimony that " . . . it would be prudent to visit the site certainly within the next day or so."

5. Finally Englehardt concededly had the authority to stop the job at any juncture.

This testimony would appear to be sufficient evidence of a *violation* of a standard of care to become a question for a jury if:

1) the violation of that standard was a causative factor of the accident and

2) the standard of care or "duty" extended to the deceased worker.

A breach of a duty of itself, not somehow tied to the decedent, is *not enough to hold the architect accountable.* "Negligence in the air, so to speak, will not do." F. Pollack, *Law of Torts*, 468 (13th Ed. 1929).

## The Duty

But we have placed the cart before the horse. Had the purported breach of duty or violation of the standard caused injury to Lucky, to which Englehardt owed an *obvious and direct duty*, we might conclude at this juncture. We must, however, determine the far more tenuous question of whether the employee of an independent contractor was within the ambit of foreseeability of Englehardt's alleged negligence.

Up to and during the nineteenth century, courts held architects accountable for fraud and collusion, but little else. But practical immunity from negligence, frequently based on privity of contract, has been gradually eroded, and liability extended on a strict, products-liability theory. *E.g., Totten v. Gruzen*, 52 N. J. 202, 245 A. 2d 1 (1968) and *Schipper v. Levitt & Sons, Inc.*, 44 N. J. 70, 207 A. 2d 314 (1965). See generally, Comment, *The Supervising Architect,*

*His Liabilities and His Remedies When A Worker is Injured,*
64 Nw. U. L. Rev. 535 (1969).

The old rule, as expressed around the turn of the century, was that an architect had no duty to supervise methods of construction for safety. His duty was seen as running directly to the employer to " . . . see that the plans and specifications are followed, that proper material is used, . . . and generally that the owner receives such a building as he contracts for . . . ." *Clinton v. Boehm,* 139 App. Div. 73, 124 N.Y.S. 789, 792 (1910). Half a century later this position was oppugned from the south. *Erhart v. Hummonds,* 232 Ark. 133, 334 S.W.2d 869 (1960), said that a supervising architect, who discovered an improperly shored excavation wall, owed a duty to the workers injured by its fall, which duty he breached by failing to stop the work.[7] It was held that the architect's negligence was properly a question for the jury.[8] Maryland has not heretofore had the occasion to decide whether we stand at or between these two extremes, and even now we postpone that inevitable decision.

Were we to find somewhat obscure the foreseeability of the consequences of neglect by an ordinary architect who contracts to design, inspect and supervise a building to be publicly used, the additional responsibility undertaken by Englehardt on behalf of the county included the obvious purpose of ensuring safe construction, not merely for the owner, but for the public as well. The entire effort of government to provide safety regulations and procedures is aimed at preserving human life and protecting the public from harm. It would not seem unreasonable to expect that a professional architect who designs and retains supervision of the construction of a building to be used by the public might be expected to perceive a risk of injury to a member of

[7]. The Arkansas Supreme Court later distinguished Erhart in the case of Walker v. Wittenberg, Delony and Davidson, Inc., 242 Ark. 97, 412 S.W.2d 621 (1967).

[8]. "In earlier cases it was frequently declared that no cause of action in tort can arise from the breach of a duty existing by virtue of contract, unless there is between the defendant and the person injured what is termed 'privity of contract.' In later cases this doctrine has been limited and modified, and in some jurisdictions and as to certain persons even rejected altogether." 59 A.L.R.2d 1081.

the public in the event of negligent design or supervision of the very foundation members of the structure. See, *e. g., Miller v. DeWitt, supra; Montigo v. Swift,* 219 Col. App. 2d 351; *Potter v. Gilbert,* 196 N. Y. 576; see also Anno. 59 A.L.R.2d 1081. If that be true, certainly a worker whose duties require that he be balanced precariously upon a steel skeleton, supported entirely by that foundation pier is within that range of apprehended danger.

Without having to decide whether the professional responsibility of an architect of public buildings does extend to the public, or more particularly here to the builder's employees obviously exposed to the results of his neglect, we find Englehardt's contract with the county to assume additional supervisory responsibilities clearly subjected him to a duty which encompassed the decedent. Rather than retain the structural engineer (Caffes) whom he engaged to design the building, as was testified by Sullivan to be the better practice, Englehardt committed himself to inspect and report on the work — expressly the concrete and structural steel work. Even more significant was his acknowledgment in his letter of August 11, 1969, that "Any changes must be approved by the Department first before work is started."

That Englehardt was faced with the requirement of providing an architect's or structural engineer's certificate of inspection and notice to the county as a condition to obtaining the building permit he had "guaranteed" to his principal is without consequence in our deliberations. We must restrict our concern solely to the fact that he did assume the duty rather than why he assumed the duty.

We do not decide whether an inspection and redesign by a qualified structural engineer would have prevented the accident. Nor do we decide whether Englehardt was aware, or should have been aware either that Collins had poured the pier or that he had permitted steel erection to commence. These are factual determinations for the jury to be considered along with testimony as to other possible direct causative factors, including the fact that the cement was poured in freezing temperature, and that it was not

adequately cured before the steel was erected without the use of safety cables.

We find that the supervisory authority given Englehardt under his contract when coupled with his inspection and notice commitments to the County, were sufficient to allow him to perceive the danger implicit in neglectful construction, at the very least to an employee in the hazardous field of structural steel erection, if indeed not to the public for whose use the structure was intended. The trial judge was correct in submitting to the jury the question of whether or not Englehardt's actions or omissions were a negligent breach of his duty to Cutlip so as to constitute a substantial causative factor of the accident which resulted in the death of Cutlip. It was an error for him to have granted a Judgment N.O.V. when the jury failed to arrive at a verdict.

## Evidence of Prior Defects

Appellants proffered the testimony of William Stehle, Chief Building Inspector for Prince George's County at the time of the fatal accident. He had conducted an extensive on-site investigation of the entire scene. Appellants' proffer was twofold. Stehle would have recited numerous defects found throughout the job-site. He then proposed to relate the defects to the standard of care required of a supervising architect.

Appellants submit that such evidence would show that Englehardt seldom and negligently inspected the work. It would further show that Englehardt was or should have been aware of the pattern of unworkmanlike conduct of the general contractor. Such knowledge, they reason, imposed upon Englehardt a greater duty to inspect and supervise. Finally they conclude that the recitation of defects shows a pattern of misconduct admissible under their view of the holding in *Locke, Inc. v. Sonnenleiter*, 208 Md. 443, 447-448:

"The rule followed by the majority of the cases is that if the evidence as to past accidents, tendencies or defects is sufficiently relevant and illuminating because there is similarity of time, place and circumstance, it will be admissible — not as direct

evidence of negligence but to show the existence of a danger or defect in the character of a place, method or appliance and to show knowledge or notice of the danger or defect on the part of the defendant, unless, in its discretion, the trial court believes it will cause an unfair surprise or confusion by raising collaterial [sic] issues."

Rather than isolating and expressing a rule, that sentence begins Judge Hammond's analysis of Maryland cases which " ... have not been entirely consistent in passing on the question." *Locke, Inc. v. Sonnenleiter, supra,* 448. After noting that the earlier trend had been interpreted to limit admissibility of "Evidence of prior accidents ... to its bearing on the question of notice, rather than to show that the condition was in fact dangerous," quoting *Town of Princess Anne v. Kelly,* 200 Md. 268, 273, he concluded that the purpose of admission was not so narrow:

"In our opinion the rule makes evidence of prior accidents or defects admissible, not only to show notice, but as bearing on the dangerous nature or tendency of the place or appliance involved in the current accident." *Locke, Inc. v. Sonnenleiter, supra,* 451.

We concede that statement to be a proper and clear expression of the law. As is frequently the case, however, the formula does not fit the facts. Here we find the facts clearly distinguishable.

In the first instance the purpose of showing knowledge was cumulative since Englehardt admitted his actual notice by acknowledging the call he received from Collins. Secondly, the recitation of defects here could have no bearing on "the dangerous nature or tendency of the place" since no accident had occurred as a result of any of the purported defects to be described.

Additionally we note further good reasons for the exclusion of Stehle's testimony. Appellants do not contest the ruling that prevented Stehle from expressing an opinion upon the standard of conduct applicable to architects since

he was clearly unqualified to do so. The trial judge pointed out that Stehle was not an architect himself but a " . . . building inspector who has a background in electrical engineering, fire protection engineering, and a Master's Degree in Public Administration." We see the lack of Stehle's architectural qualifications sufficient to justify him to be an expert as going even further. None of his expertise seems to qualify him to describe structural defects either in steel structure or concrete foundations. His qualifications for "structural engineering inspections" were even less impressive than those of Englehardt which had been called in question by the expert Sullivan. That he served as a building inspector for a local government is no evidence that he had any structural engineering expertise beyond or even equal to that of an ordinary architect.

With these considerations in mind we fully agree with the reasoning of the trial judge:

> "The reason the Court is not permitting Mr. Stehle to testify is that it feels that the defects to which he is testifying are so remote from the actual happening of this accident, and that none of the defects that he testified to had anything to do whatsoever with the happening of this accident, and therefore the testimony would be so highly prejudicial to the defendants in this case that even though otherwise it would probably be permissible, the Court feels that the prejudice to the defendant would out-weigh the benefit to the plaintiff."

The evidence as proffered was properly excluded.

> *Judgment upon the verdict directed on behalf of Lucky Stores, Inc. affirmed.*
>
> *Judgment N.O.V. on behalf of MacDonald and Englehardt, a partnership, reversed and remanded for a new trial.*
>
> *Costs to be paid one-half by the appellants and one-half by the appellee, MacDonald and Englehardt.*