667 A.2d 962

**Carroll LANE**

**v.**

**BETHLEHEM STEEL CORPORATION.**

**No. 146, Sept. Term, 1995.**

Court of Special Appeals of Maryland.

Dec. 1, 1995.

**270**

Kenneth D. Pack (Law Offices of Peter G. Angelos, on the brief), Towson, for appellant.

Benjamin R. Goertemiller (George D. Bogris and Howell, Gately, Whitney & Carter, on the brief), Towson, for appellee.

Argued before DAVIS, HOLLANDER and PAUL E. ALPERT, (retired, Specially Assigned), JJ.

ALPERT, Judge, Specially Assigned.

In this case, we are called upon to decide whether an employer/premises owner can discharge his duty to warn an independent contractor's employee of a latent danger by warning the independent contractor or his supervisory personnel.

Mr. Carroll Lane ("Lane"), an employee of BMI, Inc., an independent contractor, suffered work-related injuries while working for BMI, Inc. ("BMI"), which had been contracted to maintain the coke ovens at Bethlehem Steel Corporation's Sparrows Point Steel Plant. The unfortunate industrial accident and the events that transpired thereafter gave rise to a lawsuit filed by Lane, the injured worker, against Bethlehem Steel Corporation ("Bethlehem").

The resulting jury trial, presided over by the Honorable Lawrence R. Daniels, Circuit Court for Baltimore County, closed with the jury returning verdicts in Bethlehem's favor.

In this appeal, Lane presents three questions.

I.   Did the trial court err in instructing that if the jury found that [Lane] was injured solely as a result of his employer's failure to supervise [ ] properly, they must find [Bethlehem] not negligent?

II.   Was there legally sufficient evidence to support the trial court's instruction that the jury must find [Bethlehem] not negligent if it found that [Lane] was injured due to a dangerous condition about which he knew o[r] should have known?

III.   Did the evidence compel the conclusion that [Bethlehem] was negligent as a matter of law?

Our discussion as to the first issue answers the second issue in the affirmative; Lane was charged with the knowledge of his employer, BMI, the independent contractor. As to the third issue, certainly reasonable minds could differ as to whether BMI was warned of the potential dangers; if it was warned, then, based upon the law as explicated under the first issue, Bethlehem was not negligent.

A counterweight,[1] weighing approximately 120 pounds, used to shut a damper in an industrial oven standpipe,[2] broke off

---

**1.**   A counterweight is a weight used to hold a damper either open or shut.

**2.**   A standpipe is similar to a chimney.

and struck Lane after he pulled on a damper handle. Bethlehem had hired BMI to maintain the coke ovens; BMI, in turn, had hired Lane, sometime in May of 1989, to work on the ovens.

Mr. Joseph Samuel Barker, Lane's Job Steward, who saw the counterweight fall, explained to the jury what happened.

I checked the equipment out, walked around the other side, looked out on to the battery top for my hand signals. The counterweight was falling. It had not hit the ground yet. I saw the counterweight hit the ground; and at that same time, Carroll was going down to the ground, on his way down. He pulled himself back up. He was just like, you know, pulled himself back up.

Then he went to go down again, pulled himself back up a third time not pulling himself up, but got his balance back and stood back up rather; and by this time, I was running out to him because I thought he was hit with the counterweight.

Lane, Barker testified, did not know what had happened. Barker picked up the counterweight arm, which was "rusted all the way through." The part remaining in the standpipe, which Barker stored in his locker until he was laid off,[3] was partially rusted through.

According to Barker, in 1989, operating the standpipe mechanism was easy. Regarding safety routines, Barker stated that Bethlehem's manager asked members of Barker's crew if BMI's supervisors had discussed banging counterweights.

Q   And the Beth—the Bethlehem manager person whoever it was, you don't know his name?

A   Yes, sir.

Q   Asked your members of the crew if your boss had ever explained to you that you shouldn't bang those things, is that what he asked you?

---

3.   He then either threw away the part or left it in his locker.

A  Not in those words.  He asked us if we had ever been told that this could happen, that this is something to watch out for?  Told him no.

Q  Didn't he also ask you if your boss or your supervis[or] hadn't instructed you not to bang these counterweights?

A  Ask me that again.

Q  Didn't tne Bethlehem supervisor whoever it was also ask[ ] you if your boss hadn't told you not to bang the counterweights?

A  I can't remember if he asked me that or not, but our boss never told us not to bang them.

Lane testified that his duties included unclogging and patching stand pipes and carrying hoses and heavy equipment. Barker and Tom Leadbitter taught Lane how to operate the standpipe mechanisms.

A  Yeah.  Joe [Barker] really showed me the right way to do it, but I learned from Tom the first time, you know, Tom showed me how to basically do it just to get by.

Q  Was it Joe who told you to bang those?

A  No.  I just picked that up from watching people do it.

Barker stated that the damper had to make a tight seal, otherwise, gases and flames could shoot into the section under repair and could possibly injure anyone working in that area.

A  Okay.  Right here's where the top of the ovens would be.  These ovens are about 200 degrees.  There's a lot of gases right in here.  He's supposed to flow up and flow down through here, get caught in this here.  When you close this damper down like where it's flat in here which is to seal off the gases from coming out when the ovens dampered out, pull air through here across the top of the battery up through the other stand pipe [4] down there at the main away from where people work.

---

4.  Each oven has two standpipes, one on either side.  Repairs to the ovens and standpipes are made by shutting off one standpipe and opening the other, thereby not interrupting the continuous operation of the oven.

Q   People work here?

A   Yeah, being pulled away from outside.  If you just pull it down, that flap will do this but carbon builds up like.

Q   When you say do this, what do you mean?

A   Turn and close when you pull the damper flap, he turns and closes.  When you turn, it will turn this counterweight, keep it in that position but will be little gaps where the carbon's not smooth, kind of like when the oven gets dirty bumps and stuff all over the place.  Gas seeps around and hot [ ]air.  It's ignited.  People work up here, and people have to be up here working.  If that fire comes up, it would be 20–foot flames.

In interrogatories, read into evidence, Bethlehem admitted that it "generally maintained" the coke battery at issue.

MR. CASKEY:  Number 13, identify any person, firm or corporation which had any responsibility or duty for the maintenance of the A-battery at the time and place of the occurrence including in your answer the nature and scope of such responsibility.                                    .

Excuse me.

Answer, this Defendant [Bethlehem] generally maintained the A-battery at the time of the occurrence.  Plaintiff's employer [BMI] was engaged to do many [sic] maintenance and repairs to the battery.

.         .         .         .         .

Plaintiff's employer was engaged and responsible to gunite the stand pipe where the accident occurred.  Bethlehem Steel as owner of the battery generally maintained it subject to some of the work being contracted out as in this case.

Mr. Kerry Gordon, who was, according to Bethlehem's counsel, Bethlehem's assistant superintendent of the coke ovens and its corporate designee, discussed warnings given to BMI's supervisors.  In a deposition, introduced at trial, Gordon discussed the warnings.

Q  Do you know whether any warnings were provided to BMI employees, including Carroll Lane, that the counterweight might fall?

A  I'm unaware of anything specifically that Carroll Lane may have been told.  I am aware that BMI was notified that excessive physical force in trying to operate the damper arm was not to be performed.

Q  And why was that warning given?

A  Because it was possible to activate the manual levers I described to you on Photograph 2, could cause the counterweight arm to rotate on the shaft.

Q  And what would happen in that event?

A  That would render the damper useless.

Q  Okay.  When you say the arm would rotate, that doesn't anticipate the arm would break off and fall, does it?

A  It was a condition that was adverse to the operation of the oven, so we did not condone excessive force being applied on that mechanism.

Q  But because that oven could, at least for a period of time, be rendered useless, not because you specifically—and by you Bethlehem Steel—foresaw that that kind of pressure would result in the damper arm falling—or the damper counterweight falling and injuring an employee?  That wasn't the warning, was it?

A  I believe that in addition to the rendering of the oven useless, that the possibility of the counterweight coming off or the counterweight arm coming off, they were instructed not to do that.

Q  What is the basis for that belief?  Did you ever instruct anybody of the danger of counterweights falling?

A  I did have discussions with BMI supervision as to all the dangers on the larry car level.

Q  Did you specifically include falling counterweights?

A  Yes.

Q  And when was that discussion?

A  I couldn't tell you.

Q Do you know whether that was prior to Carroll Lane's injury?

A It was prior to BMI working on the larry car level.

Q Does that mean it was prior to October 19, 1989?

A Yes.

Gordon also stated that Bethlehem had on its staff a "gas tender" who would inspect the ovens. During his inspection, the gas tender would operate the various mechanisms associated with an oven, among them the dampers. According to Gordon, the dampers would not form a tight seal if they had been damaged due to superheating or if they had been subjected to extremely violent manual opening and closing. Although he admitted that Bethlehem had done nothing to prevent corrosion, he stated that the A-battery ovens, in operation since 1982, had not shown any signs of deterioration. Any rust noticed on the oven parts was surface rust, and scraping it off would not be prudent because that would leave bare metal, said Gordon. The gas tender would report to Bethlehem any damper that failed to shut properly.

After the October 19 incident, Bethlehem, according to Gordon, fabricated and installed a new counterweight arm in the stand pipe where Lane had been injured. Gordon pointed out that anything in the coke oven was Bethlehem's property.

The cast of characters before us include an employer/premises owner (Bethlehem), an independent contractor (BMI), and an employee (Lane). In order for us to resolve Lane's claim, we must determine what duty, if any, Bethlehem owed to him.

The Court of Appeals and this Court have, on previous occasions, enunciated the standards of care owed to an independent contractor and to the independent contractor's employee by an employer/premises owner, and to the employee by the independent contractor. In *Le Vonas v. ACME Paper Board Co.*, 184 Md. 16, 40 A.2d 43 (1944), employees of independent contractors sued the employer/premises owner, Acme Paper Board Company ("Acme"), for injuries caused by an electrical shock. *Id.* at 19, 40 A.2d 43. The employees argued that Acme "was negligent because it did not warn

them the wires were dangerous." *Id.* Judge Delaplaine explained:

> If the owner employs an independent contractor to do certain work, he owes to employees of the contractor the same duty he would owe to employees of his own to furnish them a safe place to work. When the risk to which an employee is exposed arises from causes which are concealed, the employer is bound to notify him of them, provided that he himself knows them, or by the exercise of ordinary care ought to have known of them. But while the owner must exercise reasonable care to have his own plant safe for employees of his contractor, he does not stand in the shoes of the contractor, for manifestly, if he is concerned only in the general results of the work and has no control of the details and manner in which the work is to be accomplished, he should not be liable for injuries caused to employees of the contractor during the progress of the work. On the contrary, if the injury is such as might have been anticipated as a probable consequence of the work, and the employer took no precaution to prevent it, he can be held liable for negligence. In other words, liability for injuries to a servant of an independent contractor rests upon the owner when the premises on which the stipulated work is done remain under his control and the injuries arise out of the abnormally dangerous condition of the premises, the owner being chargeable with knowledge of the danger.

*Id.* at 20, 40 A.2d 43.

Our Court, in an opinion written by Judge Lowe, understood that the

> 'abnormally dangerous conditions on the premises' referred to in *Le Vonas* do not include conditions which arise after and as a result of the independent contract. The 'conditions' are those latent dangers preexisting the contract and carrying over without the owner's taking precautions to guard against the conditions before he permits others to occupy the premises.

*Cutlip v. Lucky Stores, Inc.*, 22 Md.App. 673, 683, 325 A.2d 432 (1974). Furthermore, Judge Lowe interpreted the owner's control, as described in *Le Vonas*, as being founded upon his "superior vantage point to gain knowledge of [the] latent peril...." *Id.*

The Court of Appeals, in *Rowley v. City of Baltimore*, 305 Md. 456, 505 A.2d 494 (1986), citing to *Bauman v. Woodfield*, 244 Md. 207, 223 A.2d 364 (1966), *Le Vonas*, and *Cutlip* further qualified the notice requirement. Judge McAuliffe concluded that "[a]n employee of an independent contractor injured on the employer's premises by reason of a latent defect (known to the employer but not to the contractor or his employee) which existed when the work began has recourse against the employer." *Rowley*, 305 Md. at 475, 505 A.2d 494.

The facts of the case *sub judice* present to us a variation not touched upon by *Le Vonas:* Will notice to supervisory personnel of an independent contractor by the employer/premises owner discharge the employer's/premises owner's duty to warn the independent contractor's employee of a latent danger? The highest courts of nine jurisdictions, along with two intermediate appellate courts and the United States Fourth Circuit Court of Appeals, have tackled this issue and have answered the question affirmatively. One high court and one intermediate appellate court have ruled the opposite way. We shall consider the respective positions.

The Supreme Court of New Hampshire and a California District Court of Appeal (an intermediate appellate court) have held that the employer/premises owner cannot delegate his duty to warn an independent contractor's employee of a hidden danger. In *Stevens v. United Gas & Elec. Co.*, 73 N.H. 159, 60 A. 848 (1905), the injured employee, Maurice J. Stevens, received an electric shock and was injured as he carried out duties assigned by his employer, Frost, an independent contractor, for United Gas and Electric Company ("UGE"), employer/premises owner. The Court grounded UGE's duty in its invitation to Stevens.

The alleged negligence of the defendant consisted in maintaining or sending or having upon the [electrical] wires not properly insulated at the time of the accident a current of electricity sufficient in intensity to cause serious physical injury to one merely touching them or standing in close proximity to them. The result to be apprehended from such a state of facts was known to the defendant's agents, and to some extent to the plaintiff. The defendant was therefore chargeable with knowledge that a man at work on the staging, who should for any reason touch the uncovered wires, would receive severe and perhaps fatal injuries from the transmission of the electric current through his body. From this knowledge of the situation, a legal duty was imposed upon the defendant toward one so exposed upon its invitation to use at least ordinary care to protect him from such harm.... The fact that he was a servant of the contractor in the performance of the work did not relieve the defendant from the performance of any duty it owed him as an invitee....

The assumed fact that the contractor knew of the peculiar danger connected with the plaintiff's situation is immaterial. The duty imposed by law upon the defendant, as the owner and occupier of the premises, for the reasonable protection of its invitee, is not performed by an attempted delegation of it to a third party. It is a nondelegable duty, arising from the proprietor's control of the premises.

*Id.* at 851–53. The Court considered various hypothetical situations relevant to the issue before it, and concluded that even if Frost had informed UGE that he would inform his employees of any perils, UGE could not use Frost's promise as a shield against liability.

Or suppose Frost had agreed with the defendant to warn his men of the danger, and had failed to do so; it is plain that that fact would afford the defendant no justification for its failure to perform its duty to the plaintiff. Frost's knowledge is immaterial upon the question of the defen-

dant's performance of its duty to the plaintiff, as it would be if it owed him no duty.

*Id.* at 853.

Relying upon similar arguments, the California District Court of Appeal, in *Dobbie v. Pacific Gas & Elec. Co.*, 95 Cal.App. 781, 273 P. 630 (Cal.Dist.Ct.App.1928) (per curiam), *cert. denied,* 273 P. 630 (1929), reached the same conclusion. *Dobbie* revolved around an independent contractor's employee who was injured when he fell through a skylight located on the employer's/premises owner's property. The Court recited the general rule that the premises owner owes to the independent contractor's employees a "duty to warn them of any danger in coming of which he knows or, as a prudent person, ought to know, and of which they are not aware." *Id.* at 634. The Court added that

> [t]he duty, however, arises from the invitation and not from the contract between the contractor and the invitees, this being but the occasion for the invitation; and the fact that the invitees are servants of the contractor does not relieve the owner of any duty owning to them as invitees.

*Id.* Ruling as the *Stevens* Court did, to which it cited, the Court held that "the duty cannot be delegated; and the contractor's knowledge or notice to him of the danger is not imputable to his employees, who are invitees." *Id.*

In harmony with those cases that share the minority view is *Lechman v. Hooper,* 52 N.J.L. 253, 19 A. 215 (1890). The Court had before it the question of notice, from the employee of the subcontractor that had built a wall, to the foreman of the subcontractor responsible for the iron work.[5] Apparently, the foreman did not notify a co-employee of a potential peril, and that employee suffered injuries when the wall fell on him.

> The erector of the nuisance must give warning of its existence. He can perform this duty either personally, or by one of his own servants, or, as is no doubt often the course adopted, through the medium of the foreman of a body of

---

5. *See infra* note 6.

men who are entitled to be warned. Practically, either of such methods is safe, as, in the main, every person having a right to notice of the danger receives it; but, in case of a miscarriage by reason of neglect of the foreman, who is to abide the consequences? Assuredly, it is he whose duty the negligent foreman failed to fulfill. In the present instance the defendant was bound to give the notice in question to the plaintiff. He attempted to convey it through a co-employee of the plaintiff, and thereby such co-employee became the agent *pro hac vice* of the defendant, and in no sense the agent of the plaintiff. This would seem to be the plain, legal result, and it appears to be a consequence that is accordant with justice and public policy.... The agent of the defendant, as he claims, gave notice to the foreman, being a co-employee of the plaintiff, of the danger. He then stood by, and saw such foreman lead the plaintiff into the danger. He could not have been certain that this warning had been communicated to the plaintiff; yet he said nothing, though a word from him would have averted the catastrophe.

*Id.* at 217. The Court upheld the jury verdict in the injured employee's favor and also pointed out that the notice did not amount to a warning.

Accepting the testimony of the defendant's witnesses as wholly true, there is nothing proved in the way of showing that the plaintiff or his associates received even the faintest suggestion that they should not enter this building on account of a latent danger. The hint given was not of the presence of a peril, but of an inconvenience.

*Id.*

The policy arguments undergirding the rationale of the cases that sanction a delegation of the notice requirement are best summed up by the Supreme Courts of Ohio, Texas, and Kentucky. Electricity, and the danger associated with its use, gave rise to the cause of action in *Schwarz v. G.E. Realty Corp.*, 163 Ohio St. 354, 126 N.E.2d 906 (1955). General Electric Realty Corporation ("GE"), employer/premises own-

er, hired Duffy Construction Corporation ("Duffy"), independent contractor, to complete structural work at its plant. Schwarz, Duffy's employee who was injured, was an experienced iron worker. He received a shock when electricity travelled from high tension wires through Duffy's crane, which had swung too close to the wires, to a beam on which Schwarz was working. The Court recognized that the giving of notice by the employer/premises owner should be considered in light of practical limitations.

> It may be impracticable and well nigh impossible for a large manufacturing enterprise to give individual notices of danger, surrounding the performance of the work to be done, to many hundreds of employees who may be working in its plant for independent contractors. Their presence in the plant and their identities may be unknown to the plant management. Any large industrial plant must necessarily have within its confines many potential hazards which can not be wholly eliminated and whose presence can not always be subject to notice. Each employee of an independent contractor is under the immediate direction and supervision of his own employer, and for this reason courts take the position that, where the employer of the independent contractor is not in immediate control of the employment area and does not participate in the operation thereon, notice to the independent contractor of the hazards within the employment area is notice to his employees, as such independent contractor has the duty to transmit such notice or warning to his individual employees. Under such rule, if notice of dangerous conditions is given to the independent contractor, the employer has performed his duty so far as it applies to the employees of the contractor.

*Id.* at 910. The Supreme Court of Texas noted that the "[land] owner or occupier should not be required to foresee and anticipate that the contractor will not discharge his duty to his own employees, and there is no sound basis for requiring that the employees should be twice warned." *Delhi–Taylor Oil Corp. v. Henry*, 416 S.W.2d 390, 394 (Tex.1967). The Supreme Court of Kentucky added:

Public policy favors the rule we adopt here. It encourages the employment of contractors and subcontractors to do work requiring special skills. If the employment of an independent contractor with expertise in a particular field results in the imposition of liability upon the owner, the temptation will exist for the owner to accomplish the work with his own employees, even though they may lack the particular skills needed; because, in such case, workers' compensation would be the only remedy of the employee. *Ralston Purina Co. v. Farley,* 759 S.W.2d 588, 591 (Ky.1988).[6]

The states of Alabama, Alaska,[7] Florida, Indiana, Maine, Mississippi, Missouri, Pennsylvania, and the United States

---

**6.** According to the Kentucky Supreme Court, subcontractors, for purposes of this rule, should not be treated differently from the independent contractor's employees. *Ralston Purina Co.,* 759 S.W.2d at 591.

Appellee Farley [subcontractor's employee] seeks to make a distinction in that he was an employee of a subcontractor rather than the independent contractor. We fail to see how this distinction requires any different result as between Farley and Ralston Purina [employer/premises owner]. The subcontractor had a contract with R & W Construction Company [independent contractor], not Ralston Purina. The policy considerations are the same.

The relationship between a contractor and a subcontractor p[ ]e[r]mits a reasonable assumption that a warning to the contractor will in due course be given by the contractor to the subcontractor. It is equally important to encourage the contractor to use the services of a subcontractor for work requiring workers with a particular expertise rather than attempting to perform the work with his own employees who may lack the particular expertise. In the case of subcontractors, the burden of warning each individual workman, because of their number and changing identities from day to day, is equally as great, if not greater.

*Id.* at 591–92. The factual scenario presented before us precludes us from addressing the notice requirement as it applies to the relationship between independent contractors and their subcontractors.

**7.** The Supreme Court of Alaska allows the employer/landowner to discharge his duty to warn the employee if he has warned the independent contractor or if the independent contractor already knows of the dangerous condition.

We held in *Moloso* [*v. State,* 644 P.2d 205 (Alaska 1982)] that a landowner has a duty to warn employees of an independent contractor working on the premises of latent, hazardous conditions on the land. *Id.* at 219. However, either an adequate warning to the independent contractor or full knowledge of the condition by the

Fourth Circuit Court of Appeals all ascribe to the approach taken by Ohio, Texas, and Kentucky. *See Armstrong v. Georgia Marble Co.*, 575 So.2d 1051, 1053 (Ala.1991); *Exxon Corp. v. Alvey*, 690 P.2d 733, 737 (Alaska 1984); *Horton v. Gulf Power Co.*, 401 So.2d 1384, 1385–86 (Fla.Dist.Ct.App.), *cert. denied*, 411 So.2d 382 (1981); *Howard v. H.J. Ricks Constr. Co., Inc.*, 509 N.E.2d 201, 205–06 (Ind.Ct.App.1987); *LeVesque v. Fraser Paper Ltd.*, 159 Me. 131, 189 A.2d 375, 379–80 (1963); *Mississippi Chem. Corp. v. Rogers*, 368 So.2d 220, 222 (Miss.1979); *Hunt v. Laclede Gas Co.*, 406 S.W.2d 33, 38–40 (Mo.1966); *Valles v. Peoples–Pittsburgh Trust Co.*, 339 Pa. 33, 13 A.2d 19, 23–24 (1940); and *Honea v. West Virginia Pulp and Paper Co.*, 380 F.2d 704, 709–10 (4th Cir.1967).

The highest courts of New York and Wisconsin have held, respectively, that the owner of an instrumentality (a telephone pole and "pumpcrete" machine) can discharge his duty to warn an independent contractor's employee of any undiscoverable dangerous condition if that owner has warned the independent contractor. *Storm v. New York Tel. Co.*, 270 N.Y. 103, 200 N.E. 659, 661–62 (1936); *American Mut. Liab. Ins. Co. v. Chain Belt Co.*, 224 Wis. 155, 271 N.W. 828, 832 (1937) ("Having warned ... the employer [independent contractor], who was on the job, as to the dangers, and knowing that he had gone below, the company [owner of the instrumentality] owed no duty to warn his [the independent contractor's] employees."). The reasoning in support of the majority position, including the instrumentality cases, persuades us to adopt that approach and hold that an employer/premises owner can discharge his duty to warn an independent contractor's employees of a latent danger by warning the independent contractor or his supervisory employees.

contractor is sufficient to discharge the duty of the landowner to the employees. *Id.* at 220.

*Exxon Corp. v. Alvey*, 690 P.2d 733, 737 (Alaska 1984). Our holding is limited to notice given by the employer/premises owner to the independent contractor or his supervisory employees. We are not discussing knowledge independently gained by the independent contractor or his supervisory employees, and the effect of that knowledge in relation to the independent contractor's employee.

██ Lane argues that the trial court erred when it instructed the jury regarding Lane's knowledge of dangerous conditions on Bethlehem's property.

A person who is on the property of another to serve the business interest of the owner or occupier of the property is owed a duty of care. The owner or occupier must use ordinary care to see that those portions of the property upon which the person may reasonably be expected to use are safe or if not safe, to give the person reasonable notice of the unsafe condition.

You are instructed that if the Plaintiff was injured due to a dangerous condition about which he knew or should have known, there is no right of recovery; and your verdict must be in favor of the Defendant. In this case, you should answer question number 1 on the verdict sheet no. I instruct you that if you find that the Plaintiff was injured solely as a result of his employer's failure to supervise him properly, then your verdict must be for the Defendant, and you should answer question number [1] on the verdict sheet no. To recover damages or be barred from recovery, the negligence must be a cause of an injury.

When giving jury instructions, the trial court "must insure that the instructions fairly and accurately set forth the law applicable to the case, and that the instructions are supported by testimony or evidence presented during the case." *Odenton Dev. Co. v. Lamy,* 320 Md. 33, 43, 575 A.2d 1235 (1990). We review the instructions for error. *Id.*

In light of our adoption of the majority position on the notice issue, we hold that the trial court's instructions "fairly and accurately" set forth the applicable law. Furthermore, those instructions were supported by evidence, introduced through Gordon's deposition and Bethlehem's answers to interrogatories, that indicated that Bethlehem warned BMI's supervisors of the dangers on the "larry car level," including the "possibility of the counterweight coming off or the counterweight arm coming off. . . ." Although he could not remember what happened immediately before the counterweight fell on him, Lane testified that he had, in the past, on an

unknown number of occasions, shut the damper by jumping on the damper handle with his foot. Thus, it is clear that Lane's conduct was in direct contravention of Gordon's warning that "excessive physical force in trying to use the damper arm was not to be performed."

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.