Alyss L. MOLOSO, individually and as personal representative of the Estate of Robert Moloso, deceased, and Linda K. Moloso, individually and as personal representative of the Estate of Joseph R. Moloso, deceased, Appellants,

v.

STATE of Alaska, Appellee.

No. 4971.

Supreme Court of Alaska.

May 7, 1982.

R. R. DeYoung, Barokas & Martin, Anchorage, and Darrell E. Ries, Ries & Kenison, Moses Lake, Wash., for appellants.

Sanford M. Gibbs and Charles W. Hagans, Hagans, Brown & Gibbs, Anchorage, for appellee.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and COMPTON, JJ., and DIMOND, Senior Justice.[*]

CONNOR, Justice.

This is an appeal in a wrongful death action brought by the personal representatives of Robert Moloso and Joseph Moloso against the State of Alaska. Decedents were killed on June 21, 1977, by a rock slide while working on a state highway project in Keystone Canyon north of Valdez, Alaska. The ultimate question on appeal is whether the superior court properly directed a verdict in favor of the state.

The state desired to have one of its existing roads re-routed. To that end it developed plans and specifications and called for contractors' bids. A joint venture consisting of Central Construction Co., Manson Construction and Engineering Co., Osberg Construction Co., and Ghemm Company, Inc. [hereafter "CMOG"] was awarded the project. CMOG subcontracted the rock excavation portion of the project to the Ferrante Corporation. The Molosos, two heavy equipment operators employed by the excavation subcontractor, were killed in a rock slide while in the course and scope of their employment. In the wrongful death action which followed, it was alleged that the state proximately caused the Molosos' deaths by failing to prudently discharge its affirmative duties to assure job safety, in its status both as owner of the premises on which the rock slide occurred and as employer of the general contractor, CMOG.

After both sides presented evidence at trial, the superior court granted a motion for a directed verdict in favor of the state. The court also awarded to the state attorney's fees in the amount of $25,000.

▪ In reviewing motions for a directed verdict we must view the evidence in the light most favorable to the non-moving party. As we stated in *Teller v. Anchorage Asphalt Paving Co., Inc.*, 545 P.2d 177 (Alaska 1976):

"In reviewing a lower court's rulings pertaining to motions for directed verdict we are required to view the evidence in the light most favorable to the non-moving party, and to afford him the benefit of all inferences which the evidence fairly supports. Moreover,

It is well established that the proper role of this court, on review of motions for directed verdict . . ., is not to weigh

---

[*] Dimond, Senior Justice, sitting by assignment made pursuant to article IV, section 11 of the Constitution of Alaska.

conflicting evidence or judge the credibility of the witnesses, but is rather to determine whether the evidence, when viewed in the light most favorable to the non-moving party, is such that reasonable men could not differ in their judgment.

In such cases the appellate court applies an objective test and if there is room for diversity of opinion among reasonable people, then the question is one for the jury to decide. In other words, a jury question, or question of fact, exists whenever it can be said that from the evidence and all reasonable inferences to be drawn therefrom, fair minded people in the exercise of reasonable judgment could reach differing conclusions on the issue in controversy." (footnotes omitted).

545 P.2d at 180.

■ Thus, if it appears from the facts of this case that a legal duty was owing to the Molosos, and if it appears that a jury reasonably could have found that such a duty was breached, then the granting of a directed verdict would be error. Therefore, we must set forth the pertinent facts in order to determine whether the directed verdict was properly entered.

### I.

The Richardson Highway, as it winds through the Keystone Canyon, follows the course of the Lowe River and, at one point in the canyon, runs through a tunnel. For some time this tunnel had been a problem for the highway department in terms of maintenance and safety. The state decided to re-route the highway and avoid the tunnel by bridging across the Lowe River to the west bank, and then bridging back to the east bank at the other end of the tunnel. The rock cliffs in this area, particularly on the west bank, rise several hundred feet on a very steep incline. As some rock had to be removed on both banks, this was considered one of the most difficult and complex excavation projects the state had ever undertaken.

Several geological studies were made of the rock slopes in the area, some by state geologists and one by C. O. Brawner, an independent consulting geotechnical engineer retained by the state. All of the studies indicated that the rock faces on the west slope were fractured and underlain with many discontinuities or seams on about a 60° angle, thus making the area susceptible to slope failure, or rock slides. These discontinuities posed a special problem for excavation because by cutting across these joints and layers of rock, the support for one or more layers could be destroyed. As precautions against these hazards, Brawner recommended that a pre-bid conference be held with the potential bidders to discuss precautions, that a "stability inspector" be retained for the project, and that the contract specifications provide for loose rock removal, rock bolting, and excavation on the west bank from the top down (to prevent work from being performed under the rock) at about a 60° angle (to coincide with the major bedding planes).

The Department of Transportation prepared plans and specifications for the project and on November 8, 1976, issued a call for bids. While the plans and specifications did not inform the potential bidders of the instability of the rock slopes, they did advise that the state had done foundation reports in the area and that the reports were available for contractor review.[1] The evidence suggests that no pre-bid conference was held, and that the bidders were not otherwise cautioned as to the hazards in the area. The contract specifications did provide for the presence of a state engineer and reserved the right of the state to suspend or change the work based upon the

---

1. The state contends that "the specifications advised all potential bidders that the state had done geological and geo-technic surveys of the area where the project was to be built," but does not guide us to the portion of the record supporting that contention. The specifications referred to foundation reports for the bridges, but there was testimony that the reports were not concerned with rock excavation. The special provisions did indicate that geological mapping had been done in the area, but did not refer to any available reports.

engineer's field evaluations. Additionally, the specifications provided that rock removal was to be at an angle consistent with the angle of the bedding planes and from the top down, but there was no provision for rock-bolting.

After it was awarded the project, CMOG suggested two "value engineering proposals" prepared by Bruce Campbell, an engineer, as alternatives to the state's plans and specifications. A value engineering proposal is the contractor's presentation of an alternative method of achieving the same result at a lower cost. If the plan is accepted the state and the contractor split the cost savings. Change orders were issued by the state for the work to proceed on the basis of value engineering proposal No. 2 (VE–2). VE–2 involved a smaller bridge abutment on the west bank with reduced, but steeper, rock excavations on the west slope as compared to the original plan. Additionally, this plan required excavation beginning at road level and proceeding upward so that at times workers were under overhanging rock.

In May, 1977, the contractor staked the slopes on the west bank for excavation. When a state geologist, Mr. Lowell, observed that the slopes were steeper than the original plan had specified, he reported to the state project engineer, Mr. Gentry, the possibility of undercutting and slope failure, whereupon Gentry issued a stop-work order. After a series of meetings between state personnel and representatives of the contractor, the state's senior construction engineer, Mr. Shumway, overruled Gentry's decision and ordered the work to resume on the basis of VE–2.

On June 21, 1977, a D–8 Caterpillar tractor operated by Joseph Moloso was pioneering an access road on the west bank from the end of a work bridge to an area that had been blasted previously, so that the rubble could be removed. Although the tractor was not working in an area in which the state would pay for excavation (within the "pay lines"), there was evidence that it was doing work necessary for the completion of the project. At approximately 10:10 a. m., a rock slide killed Joseph Moloso as he was operating the tractor, and also killed Robert Moloso, who was standing in the area.

In this appeal, the Molosos advance several theories according to which the State of Alaska breached a duty of due care owed to the decedents. Under the Restatement (Second) of Torts (1965) the Molosos argue that the state assumed common law duties as an employer exercising control over an independent contractor (§ 414), as an employer failing to provide special precautions in risky work to be done by an independent contractor (§ 413), as an employer giving negligent orders or directions to an independent contractor (§ 410) and as a landowner aware of a dangerous condition (§ 343).

The state contends that the record is devoid of any evidence which will support liability on the part of the state under any of the theories asserted by the Molosos.[2] We disagree.

## II.

In general, the employer of an independent contractor owes no duty to the independent contractor's employees to protect them from the negligence of the employees' own master. On the other hand, the employer of the independent contractor does owe to these servants the duty to avoid endangering them by the employer's own negligent actions or omissions. *Sloan v. Atlantic Richfield Co.*, 552 P.2d 157, 160 (Alaska 1976). As an example of this duty, the "retained control" theory of recovery is set forth in Restatement (Second) of Torts

---

**2.** Although initially asserting six theories of recovery, both the Molosos and the state confine their discussions to the above four main topics in their briefs. Noting the confusing and overlapping terminology and the morass of standards applied in the cases cited by the parties, we agree that it is no small task to determine the particular theory under which any given case should be discussed.

§ 414 (1965) and has been expressly adopted by this court.[3] Section 414 provides:

"Negligence in Exercising Control Retained By Employer. One who entrusts work to an independent contractor, but who retains the control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care."

Under this theory, if the state as the employer of CMOG[4] retained sufficient control over the construction of the Keystone Canyon By-Pass, it should be responsible for all harmful consequences of its *own* negligent exercise of that control.[5]

■■ To determine whether the nature and extent of the control present is sufficient to impose liability, both the contractual provisions and the actual exercise of control are relevant. If the employer reserves and exercises only the right to inspect the construction work to see that the contract specifications are met while the independent contractor controls how and when the work is to be done, there is probably not sufficient retained control to subject it to liability. *See DeVille v. Shell Oil Co.*, 366 F.2d 123, 125 (9th Cir. 1966) (applying Alaska law); *State v. Morris*, 555 P.2d 1216, 1218 (Alaska 1976); Restatement (Second) of Torts § 414, Comment c (1965).[6] Similarly, if the employer retains only standard "boilerplate" provisions with respect to safety inspections and requirements, but assumes *no* affirmative duties and never directs the method of performance, there is insufficient control or supervision to render it liable. *See Morris v. City of Soldotna*, 553 P.2d 474, 480 (Alaska 1976).

■ On the other hand, if the employer retains the right to direct the manner of the independent contractor's performance, or assumes affirmative duties with respect to safety, the employer has retained sufficient control to be held liable if he exercises that control negligently. *Everette v. Alyeska Pipeline Service Co.*, 614 P.2d 1341, 1347 (Alaska 1980); *Hammond v. Bechtel Inc.*, 606 P.2d 1269, 1275 (Alaska 1980); *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933, 934 (Alaska 1968). Comment a to § 414 indicates that the degree of control retained may be less than that which would be necessary to subject the employer to liability as a master, and is therefore consistent with a generally independent contractor relationship:

"He may retain only the power to direct the order in which the work shall be done,

---

**3.** *See Everette v. Alyeska Pipeline Service Co.*, 614 P.2d 1341, 1347 (Alaska 1980); *Hammond v. Bechtel Inc.*, 606 P.2d 1269, 1274 (Alaska 1980); *State v. Morris*, 555 P.2d 1216 (Alaska 1976); *Morris v. City of Soldotna*, 553 P.2d 474, 478 (Alaska 1976); *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933, 934 (Alaska 1968).

**4.** Technically speaking, the Molosos were the employees of the subcontractor Ferrante. Any duty that flows from the state, however, is unaffected by the title "subcontractor's employee" as opposed to "independent contractor's employee."

**5.** Section 414 is sometimes referred to as an "exception" to the general rule that the employer of an independent contractor is not liable for injuries sustained by the employees of that independent contractor. Calling it an "exception," however, appears to be nothing more than a circuitous route around the simple rule that anyone, including an employer of an independent contractor, may be held liable for his or her *own* negligence. It is not necessary for us to deal again with the interesting subject of vicarious liability. The Molosos are asserting

pure direct negligence by the state in each of their theories. We are limited to discussing liability for fault by the state, regardless of any fault attributable to CMOG or Ferrante as the independent contractors.

**6.** Comment c of the Restatement (Second) of Torts § 414 (1965) states:

"In order for the rule stated in this Section to apply, the employer must have retained at least some degree of control over the manner in which the work is done. It is not enough that he has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions or recommendations which need not necessarily be followed, or to prescribe alterations and deviations. Such a general right is usually reserved to employers, but it does not mean that the contractor is controlled as to his methods of work, or as to operative detail. There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way."

or to forbid its being done in a manner likely to be dangerous to himself or others. Such a supervisory control may not subject him to liability under the principles of Agency, but he may be liable under the rule stated in this Section unless he exercises his supervisory control with reasonable care so as to prevent the work which he has ordered to be done from causing injury to others."

Restatement (Second) of Torts § 414, Comment a (1965).

Comment b provides a pertinent example:

"The rule stated in this Section is usually, though not exclusively, applicable when a principal contractor entrusts a part· of the work to subcontractors, but himself or through a foreman superintends the entire job. In such a situation, the principal contractor is subject to liability if he fails to prevent the subcontractors from doing even the details of the work in a way unreasonably dangerous to others, if he knows or by the exercise of reasonable care should know that the subcontractors' work is being so done, and has the opportunity to prevent it by exercising the power of control which he has retained in himself. So too, he is subject to liability if he knows or should know that the subcontractors have carelessly done their work in such a way as to create a dangerous condition, and fails to exercise reasonable care either to remedy it himself or by the exercise of his control cause the subcontractor to do so."

Restatement (Second) of Torts § 414, Comment b (1965). It is normally a question of fact for the jury to determine whether an employer of an independent contractor has retained sufficient control so as to make the employer liable. *Everette v. Alyeska Pipeline Service Co.*, 614 P.2d 1341, 1347 (Alaska 1980); *Hobbs v. Mobil Oil Corp.*, 445 P.2d 933, 935 (Alaska 1968).

As an alternative source of this duty, the Molosos contend that the state "assumed" a duty of due care toward the Molosos by its affirmative conduct. In *Hammond v. Bechtel Inc.*, 606 P.2d 1269, 1277 n.14 & n.15 (Alaska 1980), we noted the analytical similarity between the retention of control theory and the assumption of duty theory: "It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully . . ."[7] The Molosos contend that by stopping the work once for safety reasons, the state assumed a similar duty to proceed with due care whenever it recognized hazards or unsafe conditions. Additionally, the Molosos argue that once the state voluntarily assumed the duty of inspecting for dangerous rock, it failed to discharge that duty with due care.

The state contends that any retention of control adopted in the contract amounted to nothing more than the state's exercise of its right to have the project built according to specifications. It maintains that the contractor in this case was delegated the responsibility to insure on-the-job safety, while the state was primarily concerned with the safety of the users of the by-pass after the construction was complete.

The superior court disposed of this question by directing a verdict for the state upon the latter's motion. The court concluded that "[p]laintiffs fail to cite any portion of the contract or adduce evidence involving the state's relationship with the joint venture which would sufficiently demonstrate that the state had the right to and in fact controlled the manner of doing the work."

The Molosos relied on the contractual provisions for the project and the actual course of performance of the construction to show the degree of control retained by

**7.** In *Adams v. State*, 555 P.2d 235 (Alaska 1976), we held that once the state undertook to inspect for fire hazards, it voluntarily assumed a common law duty to inspect with care and to proceed further with regard to the recognized hazards. In *Wallace v. State*, 557 P.2d 1120 (Alaska 1976), we held that the state, by con-ducting safety inspections of a pipe installation site, voluntarily assumed a duty to use due care in attempting to remedy the unsafe condition discovered during the course of the inspection. *See* Restatement (Second) of Torts § 324A (1965).

the state. The evidence presented at trial, viewed in the light most favorable to the Molosos, indicated the following:

(1) In the standard contract specifications, the *state* engineer had the authority to suspend the work wholly or in part for unsafe conditions; for failure to carry out orders; for what the state engineer determined to be unsuitable weather; for other conditions making the continuation of the work "unsuitable;" or for any other condition or reason deemed to be in the public interest.

(2) In the special contract provisions, written particularly for the Keystone Tunnel By-Pass Project, the *state* engineer had the authority to evaluate and change slope cut angles as construction progressed; to review excavation plans of the contractor (required to be submitted prior to excavation); to require the contractor to adopt revised methods of excavation; and to determine the existence of "[a]ll rock that is loose, hanging, or creating a dangerous situation" and direct its removal.

(3) Bruce Campbell, who was Commissioner of Highways from February 2, 1971 to December 2, 1974 and wrote the Standard Specifications used by the Department of Highways, testified that the above provisions were designed "to give the State Engineer control of exactly how the excavation was conducted on the job on an almost day-to-day basis ..."[8]

(4) Ramone Shumway, Director of Highway Design and Construction for the State Department of Transportation, testified that although there was some concern about the steepness of the slopes in the VE–2 proposal, the special provisions of the contract would allow the state to make adjustments in the field as the work progressed.

(5) C. O. Brawner, independent geologist hired by the state, testified that the safety procedures in his recommendations and the special provisions were primarily for the protection of the workers and others who would be on the project site during construction.

(6) When the state geologist, Mr. Lowell, observed the slopes on the west bank that had been staked, he reported to Gentry, the state's project engineer, the possibility of undercutting and slope failure. Gentry ordered the work stopped, stating as his authority to do so the special contract provisions. Later, Shumway ordered the work resumed, as originally staked, stating that the responsibility for that decision was clearly within his jurisdiction.

(7) The acting project engineer, provided by the state according to the special provisions, was Keith Korri. He testified that to determine whether rock on the west bank was loose, hanging, or dangerous, he relied on the inspections of Dave Talvansari and Steve Lowell. He also testified that due to state restrictions on overtime work by the inspection crew, it was understood that such inspection would be minimal and some desirable information would be missed.

(8) C. O. Brawner and Donald Easterbrook, a geologist specializing in rock stability, both testified that the rock that fell and killed Robert and Joseph Moloso was exactly the type of loose, hanging, or dangerous rock that the

8. When asked why the highway department would want to retain such controls, Campbell replied, "Well, some features of highway construction are very technical in their nature, especially soils and rock, bridge construction, this type of thing, and the State needs to keep control as these things develop or unfold as they get more information during the construction, and the control has to be with the State, as I see it, or with the engineering experts, because the contractor normally doesn't provide any engineering expertise; that's not what he's bid on. He's providing construction expertise. And when it gets to a question of engineering, why then, of course, the State, with their expertise, should make that final decision."

special contract provisions required be detected and removed. They testified that other safety measures could have been implemented, including only working from the top down, or bolting the rock before working underneath it.

(9) State inspector Lowell testified that he left the Keystone Project on May 15, 1977, and returned a month later on June 15th. Lowell still felt that the excavation slope was too steep. On June 21, 1977, Lowell and Talvansari walked across the workbridge to the site under the overhanging rock where the D–8 Caterpillar was being operated. They spent several minutes inspecting the slope. Lowell commented to Talvansari that the rock in that area looked "unhealthy." Once they returned to the east bank he further commented that he was glad that he wasn't that "cat" operator, basing this on his belief that sometime during the construction project there was going to be a major failure in that cut, because of the discontinuities and the geometry of the cut slope, and because of the way it was being excavated from the bottom up. Lowell took a picture of the "cat" working. As they continued to watch, the slope did in fact fail, and Robert and Joseph Moloso were buried in the rock slide.

■ Viewing the evidence in the light most favorable to the Molosos, we find that reasonable minds could differ as to whether the state retained sufficient control over the construction operation to impose a duty of care owed to the Molosos, either by directing the manner of the independent contractor's performance, or by assuming affirmative duties with respect to safety. Therefore, we find that the superior court erred in granting the state's motion for a directed verdict on the issue of retained control, and accordingly we reverse. Because the standard of care and the causal connection between the state's acts and omissions will vary with the extent of the control retained by the state and with the extent of the duties assumed by the state, the questions of breach of duty and causation similarly must be left to the trier of fact.

### III.

The Molosos next argue that the state is liable because it negligently failed to take necessary precautions against the dangers involved in the work entrusted to a contractor. They base this theory of liability on Restatement (Second) of Torts § 413 (1965) which provides:

"One who employs an independent contractor to do work which the employer should recognize as likely to create, during its progress, a peculiar unreasonable risk of physical harm to others unless special precautions are taken, is subject to liability for physical harm caused to them by the absence of such precautions if the employer

(a) fails to provide in the contract that the contractor shall take such precautions, or

(b) fails to exercise reasonable care to provide in some other manner for the taking of such precautions."

Comment b to this section indicates that this rule is concerned with risks that are peculiar to the work to be done, arising out of the character or the site of the work, against which a reasonable person would recognize the necessity of taking precautions. Therefore, the source of this duty is the type of work to be done. The employer can either provide for the taking of the precautions by the contractor, employ another independent contractor to take these precautions, or exercise reasonable care to provide for these precautions itself (Comment c). One important factor in determining liability under this section is the extent of the employer's knowledge and experience in the field of work to be done (Comment f).

The state's response to this argument is that "as a matter of law, the rule set out in § 413 does not and should not be extended to employees of independent contractors in-

jured as a result of the contractor's negligence in performing the work." The superior court did not address this theory of recovery in its memorandum and order granting the state's motion for a directed verdict.

The state's argument misses the thrust of § 413 and the Molosos' appeal. Section 413, as the Molosos argue under the facts of this case, is a theory of *personal* rather than vicarious liability. Liability is imposed for the failure of the employer itself to adequately provide for precautions against danger.[9] The employer of the independent contractor owes a duty to the employees of the independent contractor to avoid endangering them by its own negligence or affirmative act. *Sloan v. Atlantic Richfield Co.*, 552 P.2d 157, 160 (Alaska 1976). Restatement § 413 does not require the employer to protect the worker against the independent contractor's negligence; nor does it impose vicarious liability under some idea of "non-delegable" duty. It merely requires an employer to act in a reasonable manner in providing for precautions to be taken in work that involves a peculiar risk.

The following relevant evidence, viewed in the light most favorable to the Molosos, was presented at trial:

(1) All of the geological studies of the area indicated that the rock faces on the west slope were susceptible to failure due to their peculiar fracturing and jointed structure.

(2) Because of these peculiar bedding planes, the by-pass was considered to be one of the most difficult excavation projects undertaken by the state.

(3) C. O. Brawner, retained by the state, recommended a pre-bid conference to inform all potential bidders on the project of the safety and construction hazards of the area. No such conference was held.

(4) Brawner also recommended that the state have a stability inspector on the project to evaluate the rock conditions, to advise of unsafe conditions, and to take appropriate action. While Steve Lowell testified that he performed this function at times, there was no "stability engineer" on the project in June.

(5) Brawner, Lowell, and Easterbrook identified several factors as being responsible for the rock slide including the structural weakness of the joint plane; the removal of talus material; seismic acceleration by blasting; the vibration of the caterpillar; undercut in the rock by past erosion; the lack of stabilizing methods, such as rock-bolting; the steep angle cut into the slope; excavating from the bottom

---

**9.** The state is by no means alone in its confusion regarding the application of § 413 as a theory of independent rather than vicarious liability. In *Matanuska Electric Ass'n. Inc. v. Johnson*, 386 P.2d 698, 700 n.5 (Alaska 1963), in dicta we cited this section as an exception to the general rule that the employer of an independent contractor is not responsible for the negligence of the contractor. However, we referred to § 413 in conjunction with § 427, which clearly deals with vicarious liability. This appears to be the usual context in which § 413 is applied. *See Welker v. Kennecott Copper Co.*, 1 Ariz.App. 395, 403 P.2d 330 (1965) (applying § 413 in conjunction with § 416 providing for vicarious liability). However, the language of § 413, its comments, and its context in the Restatement (under Topic 1. Harm Caused By Fault Of Employers Of Independent Contractors, rather than under Topic 2. Harm Caused By Negligence Of A Carefully Selected Independent Contractor) indicate that when applied alone it is a theory of personal fault on the part of the employer. This theory of personal responsibility has previously been recognized:

"In the first place, quite apart from any question of vicarious responsibility, the employer may be liable for any negligence of his own in connection with the work to be done. Where there is a foreseeable risk of harm to others unless precautions are taken, it is his duty to exercise reasonable care ... to provide, in the contract or otherwise, for such precautions as reasonably appear to be called for."

W. Prosser, The Law of Torts § 71 at 469 (4th ed. 1971). *See also Anderson v. Chancellor Western Oil Develop. Corp.*, 53 Cal.App.3d 235, 125 Cal.Rptr. 640, 643 (1975) (recognizing that § 413 covers the direct negligence of the employer while § 416 imposes vicarious liability); Morris, The Torts of An Independent Contractor, 29 Ill.L.Rev. 339, 349 (1935).

rather than from the top down; and failure to identify and remove the overhanging rock.

The evidence presents questions as to which reasonable minds could differ: did the work necessarily involve a danger requiring precautions? Did the state provide for the taking of these precautions by delegating certain safety responsibilities to the contractor? If not, did the state itself exercise reasonable care to provide for precautions? Although the evidence in totality may permit inferences to be drawn favorable to the state, the determination of these matters must be left to the trier of fact.

## IV.

The Molosos next argue that the state, as the engineer and architect of the Keystone Canyon Project, is liable because it negligently prepared the plans and specifications of the project and that the contractor's acts or omissions pursuant to these plans and specifications caused the deaths of Robert and Joseph Moloso.[10] The Molosos rely on the Restatement (Second) of Torts § 410 (1965):

"The employer of an independent contractor is subject to the same liability for physical harm caused by an act or omission committed by the contractor pursuant to orders or directions negligently given by the employer, as though the act or omission were that of the employer himself."

The state contends that its duties as engineer and architect did not extend to the employees of an independent contractor, as this would make it vicariously liable for the acts and omissions of the general contractor. However, the theory of liability of § 410, like the previously discussed § 413, is that of *personal* fault on the employer's part. The employer is only subject to liability for harm due to unsafe conditions caused by the imperfections in plans and specifications provided by the employer.[11] The engineer or architect owes a duty to the employees of an independent contractor to avoid endangering them by its own negligence. This includes using due care in the preparation of plans and specifications for the direction of the work. This duty is breached, that is, orders, plans, or directions are negligently given, if the employer knows or should know that the work to be done according to them involves an unreasonable risk of harm.

The state also contends that no evidence upon which reasonable minds could differ was presented to show negligence in the design or breach of the standard of care by the state in its capacity as engineer. It is undisputed that the Keystone Canyon Project was initially designed by the State of Alaska, Department of Highways. The VE–2 plan, as an alteration of the original plan, was designed by Bruce Campbell, a

10. Additionally, the Molosos contend that the state is liable due to its negligent engineering supervision. In determining whether a supervising engineer or architect owes a duty of due care to injured workers, the courts have generally looked to the extent of inspection and supervision responsibilities imposed upon or assumed by the architect or engineer, and any prior knowledge of a hazardous condition. *See, e.g., Erhart v. Hummonds*, 232 Ark. 133, 334 S.W.2d 869 (1960); *Geer v. Bennett*, 237 So.2d 311 (Fla.App.1970); *Miller v. DeWitt*, 59 Ill.App.2d 38, 208 N.E.2d 249 (1965), *rev'd in part on other grounds in* 37 Ill.2d 273, 226 N.E.2d 630 (1967). One case expressly relied on the retained control theory of § 414 of the Restatement (Second) of Torts to impose liability on a supervising architect. *Weber v. Northern Illinois Gas Co.*, 10 Ill.App.3d 625, 295 N.E.2d 41 (1973). *See also* Comment, The Supervising Architect: His Liabilities And His Remedies When A Worker Is Injured, 64 Nw.U.

L.Rev. 535 (1969); Annot., 59 A.L.R.3d 869 (1974). We find any duty owed by the state in its capacity as a *supervising* engineer to be inextricably tied to the previously discussed duties arising from a retention of control, assumed responsibility, and the need to take special precautions, and, therefore, unnecessary of repetition.

11. Comments d and h to this section point out that a finding of employer liability is not dependent upon a contractor's negligence. For example, the contractor may be negligent and the employer *not* liable where the contractor's negligence in following plans or specifications is the cause of harm. Similarly, the contractor may fully satisfy his duty of due care, but the employer *will* be liable if the orders or directions were negligently prepared and caused the work to be done in an unsafe manner.

consultant hired by CMOG (the general contractor). The VE–2 plan was approved and adopted by the state on February 24, 1977. The following pertinent evidence was presented at trial:

(1) C. O. Brawner originally recommended that the slope on the west bank be excavated at a 60° angle to coincide with the major bedding planes of the rock face, and that excavation proceed from the top down so that no work would be performed under the rock. Brawner attributed the accident in part to failure to adhere to this recommended angle and failure to excavate from the top of the slope down.

(2) The VE–2 proposal steepened the slope cut on the west bank, and required blasting lower on the face. Steve Lowell, state geologist, prepared an evaluation report of the VE–2 proposal for the state. In this report he warned of the potential failure of the existing slopes due to the increased instability caused by the steeper angle of excavation. He also recommended that if VE–2 was adopted the overhanging rock be removed and the area stabilized with rock bolts.

(3) On May 17, 1977, after the stop-work order had been issued, a meeting was held among the State Department of Transportation personnel to discuss the steepness of the slope excavation. According to the state engineer's diary, all of the project administrators agreed that the best solution would be not to proceed in accordance with the steep slope design. Despite these discussions, the state senior construction engineer directed that the stop-work order be lifted and that the contractor proceed with the excavation according to the steeper slope.

 It is the duty of an engineer or architect to exercise reasonable care, or the ordinary skill of the profession, for the protection of anyone lawfully upon the premises whose injury is reasonably foreseeable as the result of negligent design, plans, orders, or directions.[12] The state, as engineer of the project, was under a duty to exercise its skill, ability and judgment in the preparation of plans and specifications and in the adoption of alternative designs to the project. The skill and diligence which they were bound to exercise was that ordinarily required by geological engineers in a like position. In our view, that standard of care was adequately illuminated by the testimony of several professionals in the field. The state need not guarantee a perfect plan or results. But the state is liable for a failure to exercise reasonable care and skill. Viewing the evidence in the light most favorable to the Molosos, we believe that reasonable persons could conclude that the rock slide was due to a shortcoming in the state's performance of its duties as engineer of the project. The question should have been left for the jury to determine.

The state also contends that since the Molosos were not working within the area of excavation (*i.e.*, the "pay lines"), even if

12. Courts have generally defined an engineer or architect's duty of care in terms of standard negligence principles.

"The architects may be liable for negligence in failing to exercise the ordinary skill of their profession, which results in the erection of an unsafe structure whereby anyone lawfully on the premises is injured. Their possible liability for negligence resulting in personal injuries may be based upon their supervisory activities or upon defects in the plans or both. Their possible liability is not limited to the owner who employed them. Privity of contract is not a prerequisite to liability. They were under a duty to exercise ordinary, reasonable care, technical skill, and ability and diligence, as are ordinarily required of architects, in the course of their plans, inspections, and supervision during construction for the protection of any person who foreseeably and with reasonable certainty might be injured by their failure to do so, and whether or not they so exercised such is a question to be determined by the jury." *Miller v. DeWitt*, 59 Ill.App.2d 38, 208 N.E.2d 249, 284 (1965), *rev'd* in part on other grounds in 37 Ill.2d 273, 226 N.E.2d 630 (1967) (finding workers foreseeable plaintiffs). *Accord, Geer v. Bennett*, 237 So.2d 311 (Fla.App.1970); *Loyland v. Stone & Webster Engineering Corp.*, 9 Wash.App. 682, 514 P.2d 184 (1973). *See* Annot., 97 A.L.R.3d 455 (1980).

there was a duty owed to them it would not extend into this area. We find this contention similarly without merit.

The evidence presented at trial indicated:

(1) The body of Robert Moloso, and the rock that killed him, were found within the area where the actual road to be travelled by the public was to be built.

(2) While the actual pioneering of the access road was outside the pay lines, there was testimony that the work had to be done in order to clear the debris within the pay lines; this was standard construction practice; it had to be done to provide access to the rock face that had been shot previously; the development of an access road was a normal procedure of that contract; and since it was one of those things that had to be done in the very nature of the work, it was not necessary to include it as a specification in the plans.

(3) The provision requiring removal of loose, hanging, or dangerous rock applied to any area where men were working, including the overhang under which the Molosos were working.

■ While the state presented contrary evidence to establish that the Molosos and their supervisor planned what they were going to do without any prior notice to the state, reasonable persons could differ in their conclusions as to whether the Molosos were working pursuant to orders, directions, or plans issued by the state, and whether this was the proximate cause of their deaths. As such, this determination should have been left for the jury.

**13.** AS 09.50.250 provides in part:
"A person or corporation having a . . . tort claim against the state may bring an action against the state in the superior court. . . . However, no action may be brought under this section if the claim (1) . . . [is] based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a state agency or an employee of the state, whether or not the discretion involved is abused . . . ."

Finally, the state contends that the discretionary function exception to the Alaska Tort Claims Act, AS 09.50.250,[13] immunizes it from liability for the design decisions it made in conjunction with this project and, therefore, supports the directed verdict. We find that the decisions and actions of the state alleged by the Molosos to be negligent do not fall within this exception.

In *Japan Air Lines Co., Ltd. v. State*, 628 P.2d 934 (Alaska 1981), we held that the state could be held liable for injuries which resulted from the negligent design of an airport taxiway.

"The issue, as always, is whether the design decision in question involved a basic policy formulation which, under separation of powers concepts, should be immune to judicial review in a tort action, or whether the design decision at issue was merely part of the implementation or execution of a basic policy decision, and therefore not immune."

628 P.2d at 938. While the decision in the present case to re-route the highway at that particular location rises to the level of a basic policy formulation, the preparation and alteration of the plans and specifications, and the supervision of the manner in which the work was carried out, involved merely operational decisions to implement this basic policy. Once the state decided to and did undertake the task of re-routing the highway for better road maintenance, travel, and safety, it was obligated to use due care in its design and construction.

■ In *Japan Air Lines*, we relied on several cases from other jurisdictions holding that design decisions in highway construction do not come within the discretionary function exception.[14] This is not to say

**14.** Examples include: *Breed v. Shaner*, 562 P.2d 436 (Hawaii 1977) (highway design decisions involved did not require evaluation of broad policy factors and therefore did not come within discretionary function exception); *Lewis v. State*, 256 N.W.2d 181 (Iowa 1977) (claims did not focus on state's decision to build a highway, but on negligence in implementing that decision); *State v. Webster*, 88 Nev. 690, 504 P.2d 1316 (1972) (once the decision was made to construct a controlled-access freeway, the state was obligated to use due care); *An-*

that all design decisions are not immune. The Molosos allege negligence in the decision to adopt VE–2, requiring a steeper excavation of the west bank; in the decision to go ahead with the steep slope cut after the stop-work order; and in the decision to cut at this steeper slope without adopting other precautions. These types of decisions, while involving some discretion, need not be insulated from judicial review to preserve separation of powers principles. Similarly, these decisions are not basic policy formulations such that a court would be ill-equipped to investigate and balance the factors that went into the decisions. These decisions by the state are not within the discretionary function exception, and therefore the state may be held liable for any negligence in the design decisions of the Keystone Canyon Project.

### V.

■ The Molosos argue, as an alternative source of duty, that the state in its status as the landowner of the construction site owed a duty to protect other persons against harm created by a dangerous condition of the land. This duty arises in certain instances where the landowner (1) knows or by the exercise of due care should know of an unreasonable risk of harm to persons on the land, (2) should expect that these persons will not discover or realize the danger presented, and (3) fails to exercise due care to protect those persons against danger. Restatement (Second) of Torts § 343 (1965).

■ The general principle of landowner liability in Alaska was articulated in *Webb v. City and Borough of Sitka*, 561 P.2d 731 (Alaska 1977):

> "The rule that we adopt is this: A landowner . . . must act as a reasonable person in maintaining his property in a reasonably safe condition in view of all the circumstances, including the likelihood of injury to others, the seriousness of the injury, and the burden on the respective parties of avoiding the risk."

561 P.2d at 733. Implicitly included in this duty is the duty to warn of hidden dangers of which the entering person is unaware. Other jurisdictions that do not distinguish between duties owed to licensees, invitees, and trespassers have recognized this duty to warn of hidden dangers. For example, in *Rowland v. Christian*, 69 Cal.2d 108, 70 Cal. Rptr. 97, 443 P.2d 561 (1968), the court stated:

> "Where the occupier of land is aware of a concealed condition involving in the absence of precautions an unreasonable risk of harm to those coming in contact with it and is aware that a person on the premises is about to come in contact with it, the trier of fact can reasonably conclude that a failure to warn or to repair the condition constitutes negligence. Whether or not the guest has a right to expect that his host will remedy dangerous conditions on his account, he should reasonably be entitled to rely upon a warning of the dangerous condition so that he, like the host, will be in a position to take special precautions when he comes in contact with it."

70 Cal.Rptr. 97, 443 P.2d at 568.

■ Such a duty to warn, imposed upon a landowner by the latent hazardous condition of the land, would extend to the employees of an independent contractor working on the premises. However, even assuming that such a duty existed in this case, we find that any duty to warn of a latent condition was satisfied by warning or giving notice to the independent contractor

---

*drus v. State*, 541 P.2d 1117 (Utah 1975) (deciding to build the highway and specifying its general location were discretionary functions, but the preparation of plans and specifications and the supervision of the manner in which the work was carried out cannot be labelled discretionary functions); *Stewart v. State*, 92

Wash.2d 285, 597 P.2d 101 (1979) (the decision to build the freeway, to place it in a particular location so as to necessitate crossing the river, and the number of lanes involved a basic governmental policy, program or objective, but the negligent design was not essential to the ac-

or supervisory personnel.[15] Once CMOG had notice of the geological condition of the west bank, the state could not be held liable for the contractor's failure to transmit this knowledge to its own subcontractors and employees merely because it owned the premises.[16]

The evidence presented at trial indicated that copies of the Brawner and Lowell reports were not included in the pre-bid project specifications (*see supra* n.1). No pre-bid conference was held to discuss the peculiar geological hazards. However, Campbell, a consultant hired by CMOG, testified that he knew that the state was concerned with the competency and stability of the west slope as early as February 1977. Campbell also had read Lowell's report voicing his concerns by May 1977, after a copy had been given to the contractor. Although Campbell did not receive a copy of the Brawner report until after the accident, Richard Simons, the superintendent of the project for CMOG, had both Lowell's report and Brawner's report by mid-May, 1977.

This evidence, even when viewed in the light most favorable to the Molosos, indicates that there was either an adequate warning or full knowledge by the independent contractor or one supervising the work sufficient to discharge the duty of the landowner to the employees of the independent contractor. We decline to impose upon a landowner the unreasonable burden of warning each and every worker on a job site of a latent hazardous condition of the land.[17] As the Texas Supreme Court in *Delhi-Taylor Oil Corp. v. Henry* noted:

"On many projects there are a number of independent contractors, each employing scores of workmen. The identities of some of the workmen will change from day to day. To impose the duty on the owner or occupier of the premises to know and to warn every workman on the project of a dangerous condition would subject him to an impossible burden. Moreover, an independent contractor owes a duty to his employees to warn them of dangers on the premises where they are required to work which are known to him.... The owner or occupier should not be required to foresee and anticipate that the contractor will not discharge his duty to his own employees, and there is no sound basis for requiring that the employees should be twice warned.

416 S.W.2d at 394.

Therefore, the trial court's granting of the state's motion for a directed verdict is affirmed with regard to the state's duties as mere landowner.

In summary, we hold that an employer of an independent contractor may be liable to the independent contractor's employees for the employer's own negligence with regard to the work to be done. The trier of fact could have found from the evidence presented in this case that the state retained sufficient control over the Keystone Canyon Project so as to impose liability on it for the deaths of the Molosos resulting from the rock slide. The trier of fact could

---

complishment of the policy, program or objective).

15. The state contends that no duty to warn ever existed, as any danger present arose during the performance of the work and was due to the construction activity itself, rather than any latent condition of the land. As we find that any duty arising out of the latent condition of the land was not breached, we need not deal with the argument that no duty ever arose. *See generally,* Comment, The Duty To Furnish A Safe Place To Work To The Independent Contractor And His Servants, 11 Baylor L.Rev. 170 (1959).

16. This appears to be the majority rule. *See e.g., Honea v. West Virginia Pulp & Paper Co.,*

380 F.2d 704 (4th Cir. 1967); *Gulf Oil Corp. v. Bivins,* 276 F.2d 753 (5th Cir. 1960); *Brown v. American Cyanamid & Chemical Corp.,* 372 F.Supp. 311 (S.D.Ga.1973); *Storm v. New York Telephone Co.,* 270 N.Y. 103, 200 N.E. 659 (1936); *Delhi-Taylor Oil Corp. v. Henry,* 416 S.W.2d 390 (Tex.1967), *cert. denied* 389 U.S. 1021, 88 S.Ct. 592, 19 L.Ed.2d 667 (1967).

17. Of course an owner may have other independent and distinct duties requiring the discharge of greater burdens, such as those imposed by a retention of control over the work being done, or duties assumed contractually or by performance (*see supra* I–IV).

have found that the state assumed duties regarding the removal of overhanging rock or other safety measures during excavation and failed to exercise reasonable care in these areas. The trier of fact could have found that there was a foreseeable risk of harm in this work unless precautions were taken and that the state failed to provide, in the contract or otherwise, for such precautions as reasonably appeared to be called for. The trier of fact could have found that the state, as the designer and engineer of the project, failed to exercise due care in the design and giving of plans for the work. We are not saying that the trier of fact would or should make such findings, but only that it could. Accordingly we hold that it was error to direct a verdict on those issues in favor of the State of Alaska.

REVERSED and REMANDED for a new trial.

MATTHEWS, J., not participating.