Clayton PETRANOVICH, Appellant,

v.

MATANUSKA ELECTRIC
ASSOCIATION,
Appellee.

No. S–9346.

Supreme Court of Alaska.

May 11, 2001.

Charles W. Coe, Anchorage, for Appellant.

Randall J. Weddle and Jon K. Goltz, Holmes Weddle & Barcott, P.C., Anchorage, for Appellee.

Before FABE, Chief Justice,
MATTHEWS, EASTAUGH, BRYNER, and
CARPENETI, Justices.

*OPINION*

PER CURIAM.

 The superior court granted summary judgment to Matanuska Electric Association (MEA) in Clayton Petranovich's personal injury action against MEA. Petranovich argues on appeal that the superior court erred in concluding that there was no issue of material fact on the question of MEA's retained control. We review his claim de novo [1] and will affirm if there are no genuine issues of material fact [2]—if no reasonable jurors could disagree on the factual question—and MEA is entitled to judgment as a matter of law.[3] We draw all reasonable inferences in Petranovich's favor.[4]

We AFFIRM, for the reasons stated in the two thoughtful decisions issued by Judge Rene J. Gonzalez. Those decisions are set out in Appendix A and Appendix B.[5]

---

1. *See Martinson v. ARCO Alaska, Inc.*, 989 P.2d 733, 735 (Alaska 1999) (citing *Ramsey v. City of Sand Point*, 936 P.2d 126, 129 (Alaska 1997) (citation omitted)).

2. *See id.*

3. *See id.* (citing *McGee Steel Co. v. State*, 723 P.2d 611, 614 (Alaska 1986)).

4. *See id.* (citing *Ramsey*, 936 P.2d at 129).

5. We have independently reviewed the record to confirm the factual accuracy of those decisions. In some instances the decisions draw factual conclusions unwarranted in a grant of summary judgment. We have not corrected those conclusions here because they are not material to the decisions and the decisions are factually accurate in all material respects.

## APPENDIX A *

### ORDER

Defendant's Motion for Summary Judgment
and Plaintiff's Cross Motion for
Summary Judgment

## I. INTRODUCTION

Clayton Petranovich, a lineman, suffered serious injury while working on an energized power line owned by Matanuska Electric Association (MEA). At the time, Petranovich was working for an independent contractor, and was free to choose his own methods for doing the job; MEA did not retain direct control over his work. MEA is not responsible for Petranovich's acts, thus summary judgment for Matanuska Electric Association is granted.

## II. FACTS

On December 21, 1995, Clayton Petranovich suffered serious injury while working on the Matanuska Electric Association Cache Creek power line. A lineman with thirty years' experience, Petranovich was foreman of a crew that was installing "inserts"-additional utility poles, added to an existing line to support sagging wires. This work was done while the power line was energized, at approximately 14,400 volts; working with the line energized was standard practice for a project such as this one. Aside from the accident itself, there were no unusual circumstances that distinguished this particular project from others of its type.

Basically, the procedure for installing an "insert" involved moving the power lines out of the way by attaching ropes or tools to the lines and pulling on them; next, the crew would set up a new utility pole, midway between the existing poles; and finally, the linemen would secure the power lines to the new pole. This particular project was being done under contract, by a four-man crew from Vista Electrical Contractors, Inc.; Petranovich was foreman of the crew. Since the crew worked independently, there were no MEA personnel present when the accident occurred.

At the time of the accident, Petranovich and another lineman were at the top of a newly installed utility pole, securing an energized line to an insulator on a bracket that was attached to the pole. There were two lines to be attached; one, the energized line, carried 14,400 volts of electricity; the other a "neutral" line, was not energized; this line served as an electrical ground, to complete the circuit in the power distribution grid.

Before attaching the energized line, the linemen had brought the neutral line to the top of the pole, and rested it on the metal bracket. The placement of the neutral line on the metal bracket atop the pole was not the usual practice in the industry; normally, the neutral line would have been tied into an insulator, covered up, or kept out of the way until the energized line was secured. The decision to rest the neutral line on the metal bracket turned out to have disastrous consequences.

As Petranovich was attaching the energized line to the insulator, a lineman on the ground held the line under control by pulling downward on it with an attached rope. Somehow, Petranovich lost control of the line; it slipped or rolled off the insulator, and fell toward the ground. Petranovich lost his footing and tried to regain his balance, placing his right hand on the pole-near the metal bracket-and throwing his left arm outward in the air. When the energized line fell off the insulator, the lineman holding it below lost control of it. The energized line bounced back upwards, striking Petranovich on his outstretched left arm, while his right arm was still on the pole, near the metal bracket that was in contact with the neutral, non-energized line-thus creating an electrical ground. The instant that the energized line struck Petranovich's left arm, a short circuit was created, and the electric current coursed through his body. Petranovich survived the accident, but he suffered severe injuries, losing part of one arm including his hand, and losing partial use of his other arm and hand.

From a scientific point of view, Petranovich's injuries occurred because he came into contact with an energized line and an electric

---

* We have edited the superior court's decision to conform to our technical rules.

ground at the same moment; if he had contacted only the energized line, without also contacting the grounded bracket, the resulting injury would not have occurred.

## III. *THE PARTIES' ARGUMENTS*

Petranovich claims that MEA should be held liable for the accident, and MEA now moves for summary judgment. MEA argues that the risks this job entailed were completely normal for electrical linemen; Petranovich and his co-workers were well aware of these risks, and knew how to manage them safely. According to MEA, Petranovich and his crew are the sole parties at fault. Noting that an employer of an independent contractor is usually not liable for injuries incurred in the line of work by the contractor's employees, MEA concludes that summary judgment in their favor is warranted.

Petranovich cross-moves for summary judgment in his favor. He concedes that he knew the risks involved in working on an energized power line, and he does not dispute the findings from the accident investigations. Nevertheless, he posits that an employer of an independent contractor may be liable for injuries to the contractor's employees, if the employer retained control over some aspect of the work, or assumes affirmative duties with regard to safety, and fails to exercise that control with reasonable care, with the result that the employee is injured. Although he concedes that MEA did not exercise any actual control over the work while it was being done (by assigning an on-site supervisor, or the like) he argues that MEA retained sufficient control, through the terms of the contract with Vista, to trigger liability.

In support of his position, Petranovich notes that:

— the contract required Vista to comply with all applicable safety statutes and ordinances, as well as MEA's safety rules and regulations;

— MEA's design engineer was to have complete authority to transmit instructions, receive information, and interpret and define MEA's policies and decisions with respect to materials, equipment, elements and systems pertinent to the work;

— MEA reserved the right to stop work because of the weather;

— MEA reserved the right to change plans, specifications, and sequence of construction on the project;

— the contract required that Vista obtain clearance from MEA dispatch prior to working on energized equipment;

— MEA reserved the right to set specifications for the materials used;

— MEA reserved the right to remove Vista employees from the job, if they were incompetent, insubordinate, or otherwise unsuitable;

— MEA reserved the right to inspect and approve the project, and the materials and equipment used, as well as Vista's payrolls, materials invoices, and other records;

— MEA controlled the time and manner of construction on the project; and

— Vista had to perform the project according to detailed MEA instructions.

In Petranovich's view, MEA breached its duty of care, because they never provided the Vista crew with instructions on how to safely proceed with the project; MEA failed to inspect the Cache Creek project; and MEA never communicated with the crew while the work was being done.

More specifically, Petranovich points to two omissions of his own, which he claims should have triggered corrective action on MEA's part: he never contacted MEA dispatch to obtain clearance for working on the energized line, and he never contacted the dispatch to ensure that the oil circuit recloser (a device analogous to a circuit breaker, which resets itself after being activated) would be placed on the proper "one-shot" setting so that it would not reset.

Petranovich does not argue that the oil circuit recloser ("OCR") or his lack of clearance were themselves causative factors in the accident. Instead, he insists that MEA should have noticed that he was not following proper procedure, and should have intervened at that point. Had they done so,

Petranovich concludes, the accident would not have occurred.

## IV. DISCUSSION

### A. The Standard for Summary Judgment

Summary judgment is appropriate if there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.[1] The party opposing summary judgment need not establish that it will ultimately prevail at trial, but only that there exists a genuine issue of fact to be litigated.[2] In ruling on a motion for summary judgment, the court is required to draw all reasonable inferences in favor of the nonmoving party and against the movant.[3] Once the movant has made a prima facie case, the non-movant is required, in order to prevent summary judgment, to set forth specific facts showing that he could produce evidence reasonably tending to dispute or contradict the movant's evidence and thus demonstrate that a material issue of fact exists.[4] Broad generalizations and unsupported conclusory allegations are not statements of fact sufficient to prevent a grant of summary judgment.[5]

### B. The Terms of a Contract Are an Issue of Law for the Court.

In negligence cases, the existence and extent of a duty of care are questions of law for the court.[6] In general, an employer of an independent contractor is not liable for negligence of the independent contractor; however if the contracting party retains control over any part of the work, they can be subject to liability for failing to exercise that control with reasonable care.[7]

The question of whether a party exerted sufficient control to invoke liability under this rule is normally a question of fact left to the jury.[8] However, where rational minds could not disagree, this issue is subject to disposition by the court.[9] To determine whether the nature and extent of the control is sufficient to impose liability, both the contractual provisions and the actual exercise of control are relevant.[10]

In this case, Petranovich does not suggest that MEA exercised any actual control over the Vista crew as they were working; rather, he argues that MEA *did not* provide the oversight that would have prevented the accident. To support his claim that MEA retained the right to control his work, he relies solely on the terms of the contract. Since interpretation of the terms of a contract is an issue of law for the court,[11] this issue is ripe for summary judgment.

### C. Petranovich Has Not Established the Requisite Control.

The retained control theory of liability for independent contractors has been addressed on at least eleven occasions by the Supreme Court of Alaska.[12] A review of those cases,

1. See Alaska R. Civ. P. 56(c).

2. See Alaska Rent-A-Car, Inc. v. Ford Motor Co., 526 P.2d 1136 (Alaska 1974).

3. See id.

4. See Howarth v. First Nat'l Bank of Anchorage, 540 P.2d 486, 489–90 (Alaska 1975), aff'd on reh'g, 551 P.2d 934 (Alaska 1976).

5. See Fomby v. Whisenhunt, 680 P.2d 787, 792–93 (Alaska 1984).

6. See Beck v. State, 837 P.2d 105, 109 (Alaska 1992).

7. See Hobbs v. Mobil Oil Corp., 445 P.2d 933, 934 (Alaska 1968).

8. See Parker Drilling Co. v. O'Neill, 674 P.2d 770, 776 (Alaska 1983); Morris v. City of Soldotna, 553 P.2d 474, 478 (Alaska 1976).

9. See Morris, 553 P.2d at 478–79.

10. See Moloso v. State, 644 P.2d 205, 211 (Alaska 1982).

11. See Davis v. Dykman, 938 P.2d 1002, 1008 n. 7 (Alaska 1997).

12. See State, Dep't of Natural Resources v. Transamerica Premier Ins. Co., 856 P.2d 766, 773 (Alaska 1993); Dahle v. Atlantic Richfield Co., 725 P.2d 1069, 1072 (Alaska 1986); Parker Drilling Co. v. O'Neill, 674 P.2d 770, 776 (Alaska 1983); Moloso, 644 P.2d at 210; Sterud v. Chugach Elec. Ass'n, 640 P.2d 823, 827 (Alaska 1982); Everette v. Alyeska Pipeline Serv. Co., 614 P.2d 1341, 1347 (Alaska 1980); Hammond v. Bechtel, Inc., 606 P.2d 1269, 1273 (Alaska 1980); State v. Morris, 555 P.2d 1216, 1218 (Alaska 1976); Morris, 553 P.2d at 478–80; Sloan v. Atlantic Richfield Co., 552 P.2d 157, 160 (Alaska 1976); Hobbs, 445 P.2d at 934.

and comparison with the present case, reveals that MEA did not retain sufficient control to be held liable here. Although Petranovich points to a multitude of contract provisions in support of his retained control theory, those provisions undercut rather than support his argument.

The precise nature and extent of control required to incur liability under the retained control doctrine must be more than the normal right of an employer to ensure that the work is done in a satisfactory manner.

> It is not enough that [the employer] has merely a general right to order the work stopped or resumed, to inspect its progress or to receive reports, to make suggestions recommendations which need not necessarily be followed, or to prescribe alterations and deviations.... There must be such a retention of a right of supervision that the contractor is not entirely free to do the work in his own way.[13]

While the contract between MEA and Vista does have a section that discusses the time and manner of construction, that section only contains general provisions requiring the work to be done in accordance with the contract specifications. Significantly, the contract also provides that the "construction sequence is at bidder's discretion." While the contract contains a general provision giving MEA the right to conduct inspections of the project, and to stop work, the cite from *Hammond v. Bechtel, Inc.* above makes it clear that these provisions are not enough to attribute liability to MEA.

The contract provisions do allude to safety requirements in several places; however, these provisions make it clear that Vista, not MEA, was responsible for compliance with all applicable safety requirements. Generally, contract terms delegating responsibility to the contractor are enforceable, and absolve the employer from liability for the matter delegated.[14] There is nothing in the contract that suggests that MEA would retain control over safety matters, or provide supervision or safety inspections, or assume any affirmative duties in this regard. "[I]f the employer retains only standard 'boilerplate' provisions with respect to safety inspections and requirements, but assumes no affirmative duties and never directs the method of performance, there is insufficient control or supervision to render" the employer liable.[15]

In this case, there is no dispute that the risks Petranovich encountered were routine. Where the independent contractor encounters only routine risks, courts discourage shifting responsibility for those risks onto the employer.

> Every ... project has some inherent dangers for which routine precautions are necessary. The employer should not be compelled to become familiar with the routine aspects of the contractor's work and safety practices, when the contractor is already aware of the hazards and is in a better position to take preventive action.... [16]

Also significant is an area on which the contract was silent. In this case, the accident occurred during the process of attaching an energized line to a power pole; but there is nothing in the contract that specifies the procedure by which this was to be accomplished. Since the contract was silent on this point, Petranovich was free to choose his own methods, and MEA had no duty to oversee Petranovich's choice.

Petranovich argues that MEA should have noticed that he failed to call in for clearance to work on the energized wire, and MEA should have noticed that he failed to request that the oil circuit recloser be placed on its proper setting. This is irrelevant, since these oversights had nothing to do with the accident. If MEA had noticed these omissions, and had acted on them, at most they would have required Petranovich to be more attentive to proper call-in procedures. Even if MEA had a duty to ensure that Petranovich properly called in, that would not equate

---

13. *Hammond,* 606 P.2d at 1275 (citation omitted).

14. *See Dahle,* 725 P.2d at 1073.

15. *Moloso,* 644 P.2d at 211.

16. *Sievers v. McClure,* 746 P.2d 885, 889 (Alaska 1987).

to a duty to prevent the accident that occurred.

Petranovich also complains that MEA never gave him any safety instructions, nor reviewed safety procedures with him. There is nothing in the contract to indicate that MEA undertook any such obligation. Petranovich was a lineman with thirty years' experience, and the foreman for the independent contractor. Petranovich's employer considered him to be one of the their best employees, and a highly-qualified electrician who was fully familiar with safety procedures. There is nothing in the contract with Vista to suggest that MEA promised to provide an on-the-spot supervisor to oversee Petranovich's supervision of his own work crew.

This case is not comparable to other cases where employers have been held liable for the acts of independent contractors under the retained control theory. The contract provisions invoked by Petranovich do not support his claim that MEA exercised sufficient control over his work to be held liable. Petranovich's allegation that MEA had a duty to prevent this accident has no evidentiary support, and does not raise a factual dispute.

## V. CONCLUSION

This court is sympathetic to the fact that Clayton Petranovich has suffered a horrible injury, which will drastically impair his ability to live the rest of his life in a normal way. However, that fact does not justify imposing liability upon Matanuska Electric Association for circumstances that were not within MEA's control. MEA did not retain sufficient control over the work done by Vista Electrical Contractors, Inc. to be held liable for this accident.

For the reasons above, IT IS HEREBY ORDERED THAT the Motion for Summary Judgment filed by Matanuska Electric Association is GRANTED. The Cross Motion for Summary Judgment filed by Clayton Petranovich is DENIED.

DATED at Anchorage, Alaska, this 25th day of July, 1999.

/s/ *Rene J. Gonzalez*
RENE J. GONZALEZ, Superior Court Judge

### APPENDIX B*

### ORDER

Plaintiff's Motion for Reconsideration

The motion for reconsideration filed by Clayton Petranovich is denied. This court has not overlooked any material facts or legal principles here.

Although Petranovich argues that this court has overlooked or misconstrued the effect of the National Electrical Safety Code, that is not so. Before issuing its summary judgment order, this court reviewed the NESC as a whole, as well as the particular sections cited by Petranovich, and found that it has no legal effect here. The NESC does not have the force of law; it is a set of industrial standards that are intended to serve as guidelines for parties who work on electric power lines and communication lines. These guidelines have not been adopted as law in Alaska, thus they do not impose any legally binding obligation on MEA. Moreover, the NESC does not impose any non-delegable obligations on utilities as such; the code refers generically to anyone who works on or has control of electrical power lines and communication lines-this includes authorized contractors as well as utilities and other entities.[1]

In his motion for reconsideration, Petranovich argues that MEA personnel actually exercised on-site safety control as a factual matter. This argument directly contradicts the position he took prior to summary judgment, where he insisted that "MEA *never* inspected the Cache Creek project to ensure that the Vista crew was abiding by the proper safety procedures or regulations."[2] Nevertheless, this court examined the issue of

---

* We have edited the superior court's decision to conform to our technical rules.

1. *See, e.g.*, National Elec. Safety Code, § 1 012 B, § 1 011.

2. Pf. Br. Opp'n Mot. Summ. J. & Supp. Cross Mot. Summ. J., p. 9 (emphasis added).

on-site inspections, and found that there is no evidence that MEA exercised any control, through on-site inspections or otherwise, that would materially differ from MEA's normal right to inspect the progress of the work. MEA did not assume a duty to ensure Petranovich's safety.

Although Petranovich states that "the court's decision does not appear to address the significance of MEA's violation of switching and clearance procedures," this issue was addressed by the court, at page 11 of its order.

Other arguments raised by Petranovich that were not raised prior to summary judgment are not properly presented here.

For the reasons cited above, IT IS HEREBY ORDERED THAT the Plaintiff's Motion for Reconsideration is DENIED.

Dated at Anchorage, Alaska, this 12th day of August, 1999.

/s/ *Rene J. Gonzalez*
RENE J. GONZALEZ, Superior Court Judge